Dorothy **GAUTREAUX** et al., Plaintiffs-Appellees,

v.

George W. **ROMNEY**, Defendant-Appellant,

and

The **City of Chicago, Central Advisory Council, and Chicago Housing Authority,** Intervenor-Appellants.

Nos. 71–1732 to 71–1734 and 71–1807.

United States Court of Appeals, Seventh Circuit.

March 8, 1972.

Rehearing Denied April 26, 1972.

L. Patrick Gray, III, Asst. Atty. Gen., James R. Thompson, U. S. Atty., Alan S. Rosenthal, Anthony J. Steinmeyer, Attys., Dept. of Justice, Washington, D. C., for defendant-appellant.

Richard L. Curry, Corp. Counsel, Earl L. Neal, Asst. Corp. Counsel, William R. Quinlan, Daniel R. Pascale, Chicago, Ill., for intervenor-appellant City of Chicago.

H. Ernest Lafontant, Chicago, Ill., for intervenor-appellant Central Advisory Council.

Kathryn M. Kula, Patrick W. O'Brien, Watson B. Tucker, Chicago, Ill., for intervenor-appellant Chicago Housing Authority; Mayer, Brown & Platt, Chicago, Ill., of counsel.

Bernard Weisberg, Alexander Polikoff, Milton I. Shadur, Cecil C. Butler, Charles R. Markels, Merrill A. Freed, Chicago, Ill., for plaintiffs-appellees.

Barbara H. Sidler, Chicago, Ill., for League of Women Voters of the U. S., League of Women Voters of Ill., League of Women Voters of Cook County and League of Women Voters of Chicago, amici curiae.

Before SWYGERT, Chief Judge, DUFFY, Senior Circuit Judge and SPRECHER, Circuit Judge.

DUFFY, Senior Circuit Judge.

This is the third round before us of a bitterly contested controversy. Two suits were commenced in 1966. Our first opinion, by a divided court, appears in Gautreaux v. Chicago Housing Authority, et al., 436 F.2d 306 (7 Cir., 1970). We there held it was not an abuse of discretion for the District Court to impose dead lines and to order the Chicago Housing Authority (CHA) to use its best efforts to increase the supply of dwelling units as rapidly as possible.

On the second appeal (Gautreaux v. Romney, 448 F.2d 731 (7 Cir., 1971)), we concluded that summary judgment

should be granted to plaintiffs on both Counts I (Fifth Amendment) and II (42 U.S.C. § 2000d, § 601 of Civil Rights Act of 1964), and that HUD had violated the due process clause of the Fifth Amendment by its acquiescence in the pre-1969 site selection procedure of Chicago Housing Authority. However, we made the following statement: "[We] again point out that our holding should not be construed as granting a broad license for interference with the programs and actions of an already beleaguered federal agency [HUD] It may well be that the District Judge, in his wise discretion, will conclude that little equitable relief above the entry of a declaratory judgment and a simple 'best efforts' clause will be necessary to remedy the wrongs which have been found to have been committed."

The District Court did not choose to follow our suggestions in this respect. On October 1, 1971, 332 F.Supp. 366, the court signed an order enjoining the defendant, George W. Romney, Secretary of the Department of Housing and Urban Development (HUD) from making available to the City of Chicago, any funds for the second period of the Model Cities Program unless the City complied with certain stated conditions. This order involved the withholding of approximately $26,000,000 in federal funds.

Funds for the purpose of constructing, maintaining and achieving low rent housing are provided by the United States Housing Act of 1937 (42 U.S.C. § 1401 et seq.). The Secretary of HUD is charged by law with the administration of such funds. CHA does not provide any housing, low rent or otherwise, with any funds distributed under the Model Cities Programs.

The Model Cities Programs are created under the Demonstration Cities and Metropolitan Development Act of 1966 (42 U.S.C. §§ 3301 et seq.). Under these Programs the Secretary of HUD is authorized to grant funds for the purpose of enabling cities to undertake various programs for the benefit of low and moderate income people.

Under this legislation, the City of Chicago is and has been carrying on a five-year Model Cities Program. The City has received or was scheduled to receive $38,000,000 a year to carry on various services, which included numerous educational and job-training programs, health care centers, day care centers and other related activities. Approximately 4000 people are employed to carry out the Model Cities Program of Chicago and its related activities. The chief beneficiaries are the poor people of Chicago, many of whom are black.

Among those greatly benefited by the Model Cities Programs are 4328 CHA tenant families at the Robert Taylor Homes (population 27,030), and the 1444 tenant families at the Washington Park Homes (population 8755), located in the City of Chicago. These developments are within the near South Side Model Cities target areas.

There are no District Court findings that the Chicago Model Cities Program has been improperly administered or that it is tainted with racial discrimination. Indeed, the plaintiffs have made no such claim. About 150,000 people are direct beneficiaries of one or more of the Model Cities Programs' activities in the Chicago area.

HUD was prepared to release the remaining sum of $26,000,000 to this Model Cities Program. It would have done so except for this proceeding instituted by plaintiffs. It is candidly admitted that the purpose of the District Court's order was intended to apply pressure on the City of Chicago to compel it to approve of CHA housing sites. The decision to release the $26,000,000 for Model Cities Programs was that of George Vavoulis, HUD Regional Director.

The Regional Director (Vavoulis) was greatly concerned at the devastating impact upon the city's poor which would follow the cutting off of the Model Cities Programs and which, he felt, would far outweigh the hope of spurring the Chicago City Council into action approving low cost public housing sites in predominantly white areas.

Intervenor-appellants well state the question before us to be: "But here one party (HUD) had been ordered to stop financing a program, Model Cities, which is free from taint, in order to force a non-party (City of Chicago) to comply with an order in a case in which it was not a party, nor charged with anything, nor found to have done anything improper and of course, not ordered to do anything."

In a Civil Rights case, the Court's task is "to correct, by a balancing of the individual and collective interests, the condition that offends the Constitution." Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). But here there was no balancing of interests. The rights of the many thousands of beneficiaries of the Model Cities Program were entirely ignored.

The District Court here proceeded as though HUD, in some court proceeding, had been found guilty of some wrongdoing in administering the Model Cities Program in Chicago. This, of course, is not the case.

In a memo to the District Court, HUD stated with reference to the Housing program: "Although the city's [Chicago] performance to date has not come up to expectations, nevertheless, the city has made some progress in achieving the housing goals set forth in the letter of intent."

HUD also wrote to the District Court: ". . . and since Model Cities money will contribute to essential social services for inter-city residents, it would not be in the best interests of HUD or the citizens of Chicago, to withhold the Model City Funds at this time."

We think it was improper for the District Court to threaten the termination of a program which was not tainted with discriminatory action in order to bring about a cure of a separate program which was found to have been so tainted.

Certainly, the District Court's order lacked a balancing of the individual and collective interests involved. The Court ignored the interest of poor people, mostly black, intended by Congress to be the beneficiaries of the Model Cities Programs while seeking enforcement of a timetable for the erection of housing units in white areas which, although laudable, could not be achieved in time to prevent the catastrophe threatened by the District Court's order terminating federal funds to a program not found to be discriminatory.

In our mandate of Gautreaux v. Romney, *supra*, (Gautreaux II) issued on September 10, 1971, and in the mandate of the earlier companion litigation decided by our Court, Gautreaux v. CHA, *supra* (Gautreaux I), we found violations of plaintiffs' rights in federal and city programs for low-income public housing to be made available to low-income families in Chicago.

In spite of minimal Model Cities Program involvement with low-cost public housing for low-income families, the District Court, following our mandate in Gautreaux II, found it advisable to terminate the entire Model Cities Program in Chicago in order to bring pressure to bear upon the Chicago Housing Authority, the Chicago City Council and the Mayor of Chicago. While the Model Cities Program in Chicago does include activities affecting housing and relocation (six of fifty or more Model Cities Program activities) within its broad aim of social, economic and educational assistance to low-income families, these six activities entail expenditures of only $3,000,000 of a total annual budget of $38,000,000 for the Model Cities Program.

In the last of a series of letters between Mr. Vavoulis, the Regional Director of HUD, and the Mayor of Chicago, dated January 6, 1972, the entire annual funding of $20,000,000 for the Neighborhood Development Program (NDP) for 1971 was formally terminated by HUD. Mr. Vavoulis stated as his rationale for such termination: "It was our [HUD's] sincere belief that the City and CHA proposals as outlined in the Letter of Intent [May 12, 1971 letter] would lead

to a meaningful replacement and expansion of the housing supply for Chicago's low income families . . . that result has not occurred. . . ."

Plaintiffs argue on this appeal that if HUD was justified in refusing the NDP program, it hardly could have been an abuse of discretion for the District Court to direct HUD to take the same position with respect to the Model Cities Program, owing to the fact that both programs have essentially the same relocation requirements. What plaintiffs fail to realize in their argument is the fact that relocation and housing is the entire purpose of the NDP program while, as noted previously, relocation and housing-related activities compose only six of fifty or more activities under the Model Cities Program.

In Board of Public Instruction of Taylor County, Fla. v. Finch, 414 F.2d 1068 (5 Cir., 1969), a case discussed by all parties to this appeal, the Department of Health, Education and Welfare terminated all federally-financed activities because of segregation in elementary schools and high schools in the county. The Court of Appeals held that schools and programs are not condemned *en masse* by Section 602 of the Civil Rights Act of 1964 where racial discrimination and segregation are found in isolated activities, but only if such activities utilize federal money for unconstitutional ends. The Court of Appeals in *Taylor County, supra,* reasoned that wholesale cutoffs of federal funds from all related federally-funded programs was not required under the Civil Rights Act of 1964. Instead, a case-by-case application of principles of nondiscrimination to particular activities should be applied.

Plaintiffs assert that Section 602 applies to administrative, not to judicial termination of funds, and certainly is not inhibiting on the equitable remedial powers of federal courts. Yet, Section 602 and the mandate of the *Taylor County, supra,* decision, prohibit HUD and other federal agencies from doing precisely what the District Court has ordered—enjoining all federal funding from

a program where the only possible violations found in *Gautreaux* I and II might possibly exist in six of fifty or more activities. Heretofore, no discrimination has been found in these six activities of the Model Cities Program.

The policy of limiting administrative power to terminate federal funds to activities which only are discriminatory or segregated, was not for the protection of the political entity whose funds were severed, but for the innocent beneficiaries of the programs and activities not tainted by discriminatory tactics. As indicated by the comments of Senator Pastore in debates concerning the adoption of Section 602—"'. . . We would not have to cut off assistance to 100 people because 1 person was being discriminatory in the administration of the money.'" (Quoted 414 F.2d at 1075, 76 n. 12), the aim of the Act was not to deprive needy recipients of funds for nondiscriminatory programs or activities.

■ It was and is the desire of the United States Government to provide breakfasts, day-care centers, improved and expanded educational facilities and adequate medical facilities for the needy through the Model Cities Programs. Other Program activities included nondiscriminatory public housing encompassed in six of the fifty activities of the Program. We believe Congress did not desire a policy of forsaking all the beneficial aspects of the Model Cities Program not tainted by discrimination for one aspect of the Program which could be, but has not yet been found to be discriminatory.

The judgment of HUD that Model Cities funds should be released was supported by the evidence in this case. In our view, the District Court's judgment and the November 11, 1971 order enjoining all these funds, was an abuse of discretion.

■ Defendant-appellant Romney and the various Intervenor-appellants have appealed both the order of the District Court issued on October 1, 1971 and the

injunction granted by the District Court on November 11, 1971 following the issuance of our mandate in *Gautreaux* II. Motions were presented by the various appellants to our Court to consolidate the two appeals: that the record of the first appeal stand as the record in the consolidated appeal; that the briefs for the prior appeal stand for the subsequent briefs; that the prior briefing schedule remain in effect and that the time for oral argument similarly remain in effect.

The only motion presented by plaintiffs-appellees was a motion to dismiss the prior appeal of the October 1, 1971 order for reason of mootness. Plaintiffs argue the order lapsed by its terms upon our issuance of the Gautreaux II mandate, and the substantive issues of both appeals are identical.

We feel the motion to dismiss the appeal of the October 1, 1971 order made by plaintiffs-appellees on appeal is persuasive. The November 11, 1971 injunction incorporated the entirety of the requirements and guidelines of the October 1, 1971 order following the issuance of the *Gautreaux* II mandate. Therefore, the appeals numbered 71–1732, 71–1733 and 17–1734 before our Court, appealing the October 1, 1971 order, should be dismissed for reason of mootness. The issues raised by this appeal are before our Court in this appeal of the November 11, 1971 injunction, Appeal No. 71–1807, and were considered herein.

By reason of our finding that the November 11, 1971 injunction granted plaintiffs-appellees was an abuse of discretion by the District Judge, we reverse his judgment and remand this cause to the District Court for proceedings not inconsistent with this opinion.

Reversed and remanded.

1. The separate-but-equal doctrine of Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), was struck down in 1954. Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

2. The non-white population of Chicago is 34.4 percent. Department of Commerce,

SPRECHER, Circuit Judge (dissentings.

I respectfully dissent.

The question posed by this appeal is whether a district court can or should cut off federal funds to the City of Chicago under the Model Cities Program because of the city's failure to approve housing sites in predominantly white neighborhoods under the federal Low-Rent Housing Program.

### I

Black tenants in and applicants for public housing brought suit in 1966 against the Chicago Housing Authority (CHA). Plaintiffs charged that CHA intentionally violated 42 U.S.C. §§ 1981 and 1983 in maintaining existing patterns of residential separation of races by its tenant-assignment and site-selection procedures, contrary to the Fourteenth Amendment.

In granting the plaintiffs a summary judgment upon "thousands of pages of depositions, affidavits and exhibits," the district court found: (1) Until 1954, CHA refused to permit black families to reside in four public housing projects located in white neighborhoods and built before 1944.[1] (2) Since 1954, CHA had imposed a black quota on the four projects; as of December 31, 1967, black tenants occupied between 1 and 7 percent of the 1,654 units.[2] (3) As of July, 1968, CHA operated 64 public housing sites with 30,848 units; except for the four segregated white projects, the tenants were 99 percent black. (4) Exclusive of the four white projects, 99½ percent of the total units operated by CHA were located in areas which were or soon would be substantially all black.[3] (5) About 90 percent of the waiting list of 13,000 persons were black. (6) The

*General Population Characteristics— Illinois,* Table 16.

3. They were located in neighborhoods with between 50 and 100 percent black population.

City Council under Illinois law must approve all sites prior to acquisition by CHA. (7) A pre-clearance arrangement existed under which CHA informally submitted sites for family housing to the alderman in whose ward the site was located. The aldermen to whom sites in white neighborhoods were submitted vetoed these sites on racial grounds. Between 1954 and 1967 CHA selected sites for 18,784 family units, of which 7,883 were in white areas and 10,901 in black areas. The City Council rejected 99½ percent of the units proposed for white sites, but only 10 percent of the black units. (8) There were in the City of Chicago 188,000 white families and 76,000 black families eligible for public housing, but most white families did not choose to move into all-black projects in all-black neighborhoods. Gautreaux v. Chicago Housing Authority, 296 F. Supp. 907 (N.D.Ill.1969).

No appeal was taken from these findings.

The district court denied the plaintiffs' request for "granting a narrow, drastic kind of relief—that of enjoining the use of federal funds" in favor of giving the parties time to attempt to formulate a comprehensive plan to prohibit the future use and remedy the past effects of CHA's unconstitutional site-selection and tenant-assignment procedures. This was done, however, without "precluding plaintiffs from showing on the basis of more facts that denial of federal funds is an appropriate form of relief." 296 F.Supp. at 915.

On July 1, 1969, the district court entered a judgment order which comprised a comprehensive plan under which 700 units were required to be built in predominantly white areas; thereafter, at least 75 percent of dwelling units built by CHA were required to be constructed in predominantly white areas.[4] In or-

der to create small and widely dispersed housing units, family housing was to be built in structures of three stories or less. No more than 15 percent of a single census tract could be composed of public housing units. The judgment order was declared to bind not only CHA but also "those persons, including the members of the City Council of the City of Chicago, in active concert or participation with them who receive actual notice of this order by personal service or otherwise." Finally, the court required that "CHA shall affirmatively administer its public housing system . . . to the end of disestablishing the segregated public housing system which has resulted from CHA's unconstitutional site selection and tenant assignment procedures" and that "CHA shall use its best efforts to increase the supply of Dwelling Units as rapidly as possible. . . ." Gautreaux v. Chicago Housing Authority, 304 F.Supp. 736 (N.D.Ill. 1969).

No appeal was taken from this judgment order.

The district court retained jurisdiction. From the time of the entry of the judgment order of July 1, 1969 to December, 1970, CHA submitted no sites for family dwelling units to the City Council. Plaintiffs were advised that CHA had no intention to submit any sites prior to the Chicago mayoralty election scheduled for April, 1971.

On July 20, 1970, the district court modified the "best efforts" provision of the judgment order to require CHA to submit sites for no fewer than 1,500 dwelling units to the City Council on or prior to September 20, 1970. On appeal, the timetable order (revised to take into account appeal time) was affirmed by this court in Gautreaux v. Chicago Housing Authority, 436 F.2d 306 (7th Cir. 1970), cert. denied, 402 U.S. 922, 91 S.

---

4. The judgment order distinguished between "Limited Public Housing Area," meaning that part of Cook County lying within census tracts having 30 percent or more non-white population or within a distance of one mile from any point on the outer perimeter of any such census tract, and "General Public Housing Area," meaning the remaining part of Cook County.

Ct. 1378, 28 L.Ed.2d 661 (1971). Judge Duffy concluded (page 313):

"In view of the fact that HUD-approved sites for 1500 Dwelling Units were awaiting submission to the City Council and that the arguments put forward in favor of delaying submission were based on political considerations and community hostility, reasons which had been properly rejected by the lower court in the original litigation, we hold that it was no abuse of discretion for the District Judge to impose deadlines for submission one year after the entry of the original 'best efforts' order."

The same plaintiffs who carried on the CHA litigation had, simultaneously with the filing of that complaint in 1966, filed another complaint against the Secretary of Housing and Urban Development (HUD). Plaintiffs sought a declaration that HUD had "assisted in the carrying on . . . of a racially discriminatory public housing system, within the City of Chicago" and an injunction against HUD's making available to CHA any federal funds to be used in connection with or in support of the racially discriminatory aspects of the Chicago public housing system.

In that case, the district court had dismissed all four counts of the complaint. On appeal, this court held that HUD had violated the due process clause of the Fifth Amendment and that summary judgment should be granted in plaintiffs' favor on Counts I (Fifth Amendment) and II (42 U.S.C. § 2000d, which is section 601 of the Civil Rights Act of 1964). Gautreaux v. Romney, 448 F.2d 731 (7th Cir. 1971).

This court found and held: (1) Between 1950 and 1969 HUD approved and funded CHA-chosen family housing sites located in black areas of Chicago because of "HUD's decision . . . that it was better to fund a segregated housing system than to deny housing altogether to the thousands of needy Negro families of that city." (2) Between 1950 and 1966 alone HUD spent nearly $350 million on CHA projects. (3) HUD exercised its powers "in a manner which perpetuated a racially discriminatory housing system in Chicago;" HUD and its officials were aware of that fact. (4) ". . . [C]ommunity and local government resistance to . . . 'the only constitutionally permissible state policy' . . . has not yet been accepted as a viable excuse for a segregated result." (5) "[W]e are unable to avoid the conclusion that the Secretary's past actions constituted racially discriminatory conduct in their own right."

Judge Duffy, again writing for this court, said at pages 740–741:

". . . [W]e state *only* that the Secretary must be adjudged liable on these particular facts and again point out that our holding should not be construed as granting a broad license for interference with the programs and actions of an already beleaguered federal agency. It may well be that the District Judge, in his wise discretion, will conclude that little equitable relief above the entry of a declaratory judgment and a simple 'best efforts' clause will be necessary to remedy the wrongs which have been found to have been committed. . . . [W]e defer to the District Court for . . . resolution [of such considerations]."

II

While the CHA and HUD cases were proceeding through the courts to determinations that both agencies were guilty of unconstitutional racial discrimination, HUD had approved a grant of some $38 million to the City of Chicago to be used during calendar year 1970 to administer its first-year activity under a contemplated five-year Comprehensive City Demonstration Program (Model Cities Program), established by the Demonstration Cities and Metropolitan Development Act of 1966 (42 U.S.C. § 3301 et seq.). In approving the first-year grant, HUD advised the city:

"The Department . . . expects full compliance by the City and all its

agencies . . . with the provisions of any decree finally entered by the U. S. District Court in the case of Gautreaux v. Chicago Housing Authority. . . ."

An application for another $38 million for the second-year Model Cities Program during calendar year 1971 resulted in discussion between city and HUD officials regarding the Chicago housing supply. On November 19, 1970, a "team composed of city and HUD regional staff" had found that, to maintain the July 1, 1969 housing supply level for low-income families, 6,200 new units were required. However, HUD advised the city that, in view of the difficulty of accomplishing that task, it would accept the reduced figure of 4,300 units "if the plans to provide the lesser number of units are quite precise." HUD said it would not approve funds for the second year of the Model Cities Program nor funds for the second year of Chicago's Neighborhood Development Program under the Housing Act of 1949 (42 U.S.C. §§ 1469–1469c) until the city had provided "specific plans to overcome this deficit of 4300 units."

Thereafter a "letter of intention" was signed on May 12, 1971 by the mayor of Chicago, the chairman of CHA and the regional administrator of HUD, indicating in detail how the housing deficiency would be met. CHA was to acquire sites for 1,700 units under a timetable of 500 units by June 15, 1971, 350 units by September 15, 1971, and 850 units by December 15, 1971. On June 21, 1971, HUD approved $26 million for the second year of the Model Cities Program (HUD had previously released $12 million) "on the condition that . . . Chicago Housing Authority will continue to show progress toward the housing goals set forth in the Letter of Intention."

By September 15, 1971, sites for only 288 low-income public housing units in predominantly white areas had been approved.

This court's opinion in Gautreaux v. Romney, 448 F.2d 731, was handed down September 10, 1971. On September 17, before the mandate issued, the plaintiffs moved the district court under Rule 62 (c) of the Federal Rules of Civil Procedure for an "injunction pending appeal." During a four-day hearing, the regional administrator of HUD testified that he had determined to release the Model Cities funds to Chicago. The court then enjoined HUD from paying Chicago any monies for the second year of the Model Cities Program unless and until 700 housing units had been given City Council approval. The order was appealed by CHA, the City of Chicago and the Central Advisory Council, an organization representing present tenants in CHA public housing, all of which had intervened in the HUD case prior to the entry of the order (Appeals Nos. 71–1732, 71–1733 and 71–1734).

The mandate issued on November 11, 1971 and, on plaintiffs' motion for an order pending final judgment, the district court on the same day entered an order similar to the October 1 order. It enjoined HUD from paying Chicago any second-year Model Cities Program money unless at least 700 dwelling units in white areas had received City Council approval. HUD appealed the November 11 order (Appeal No. 71–1807).

### III

The first inquiry should be whether the district court possessed sufficient equitable power to enjoin HUD from disbursing Model Cities funds to Chicago until the City Council approved sites for 700 units in predominantly white areas under another HUD-supervised program, the Low-Rent Housing Program (42 U.S.C. § 1401 et seq.).

Acting as chancellor, a federal district judge has broad and flexible powers of equity to mold each decree to the necessities of the particular case and to remedy the consequences of past constitutional violations. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 15, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939 (1946); Hecht Co. v.

Bowles, 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944); Deckert v. Independence Shares Corp., 311 U.S. 282, 288, 61 S.Ct. 229, 85 L.Ed. 189 (1940). Federal courts have a duty to be alert to provide "such remedies as are necessary to make effective the congressional purpose." J. I. Case Co. v. Borak, 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964). They also have a duty to exercise remedial powers when local authority defaults in remedying constitutional violations. Swann v. Charlotte-Mecklenburg Board of Education, *supra* 402 U.S. at 16, 91 S.Ct. 1267.

The district judge conclusively declared that CHA had violated the Fourteenth Amendment because of its racial discrimination in housing. 304 F.Supp. 736. This court declared that HUD had violated the due process clause of the Fifth Amendment because of its racial discrimination in housing. 448 F.2d 731, 740.

Racial discrimination in housing is contrary to the clearly expressed purpose of Congress. That purpose appeared as early as the Civil Rights Act of 1866.[5] It was emphasized by the Civil Rights Act of 1964, which prohibits racial discrimination in federally assisted housing.[6] It was strengthened by the Civil Rights Act of 1968, which requires affirmative action to promote fair and non-discriminatory housing:[7]

> "It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601.

Section 3608 of that act provides:

> "The Secretary of Housing and Urban Development shall—
>
> \*   \*   \*   \*   \*   \*
>
> "(5) administer the programs and activities relating to housing and urban development in a manner *affirmatively to further* the policies of this subchapter (emphasis added.)"

For guidance in effectuating Congress' purpose in housing, the courts have available the parallel area of school desegregation. The Supreme Court has held that school authorities are "clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." Green v. County School Board, 391 U.S. 430, 437–438, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968). When local authorities fail in their affirmative obligations, federal courts must step in. The Supreme Court recently discussed the nature of judicial power in such a situation in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 28, 91 S.Ct. 1267, 1282, 28 L.Ed.2d 554 (1971):

> "The remedy for such segregation may be administratively awkward, inconvenient and even bizarre in some situations and may impose burdens on some; but all awkwardness and inconvenience cannot be avoided in the interim period when remedial adjustments are being made to eliminate the dual school systems. .   .   .

---

5. 42 U.S.C. § 1982: "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." *See* Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968).

6. 42 U.S.C. § 2000d: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

7. In Shannon v. United States Department of Housing and Urban Development, 436 F.2d 809, 816 (3rd Cir. 1970), the court observed: "In 1949 the Secretary .   . could not act unconstitutionally, but possibly could act neutrally on the issue of racial segregation. By 1964 he was directed, when considering whether a program of community development was workable, to look at the effects of local planning action and to prevent discrimination in housing resulting from such action. In 1968 he was directed to act affirmatively to achieve fair housing."

**134**

"In this area, we must of necessity rely to a large extent . . . on the informed judgment of the district courts in the first instance and on courts of appeal."

I conclude that the district court in the present case possessed the equitable power to fashion the remedy which he applied.

## IV

A more difficult question is whether the lower court, armed with this power, abused its discretion in cutting off funds to one federal program in order to promote fair housing under another government program. Although the congressional mandate requiring the affirmative provision of fair housing amply justifies full opening of the judicial arsenal, selection of the weaponry requires a delicate balancing of competing interests and policies. "No fixed or even substantially fixed guidelines can be established as to how far a court can go, but it must be recognized that there are limits." Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 28, 91 S.Ct. 1267, 1282, 28 L.Ed.2d 554 (1971).

The first and most obvious guideline is what power the executive branch, in affirmatively providing fair housing, has to cut off the funds from one program to achieve fair housing under another program. Lack of that power would not preclude judicial use of the same power, but its existence would furnish executive and administrative, as well as congressional, condonation of the specific remedy as well as of the end to be achieved.

It has already been noted that Congress, in defining the duties and responsibilities of HUD under the fair-housing title of the Civil Rights Act of 1968, mandated HUD to *"administer the programs and activities* relating to housing and urban development in a manner affirmatively to further the policies" of providing fair housing throughout the United States. 42 U.S.C. § 3608(d) (5). Congress did not direct that each program or each activity be administered to achieve fair housing in that particular program or activity, but that all programs and activities be administered to achieve the target objective.[8]

On November 20, 1962, President Kennedy issued the Executive Order on Equal Opportunity in Housing No. 11063 (at 42 U.S.C. § 1982), which states in part (emphasis added):

"I hereby direct all departments and agencies in the executive branch of the Federal Government, insofar as their functions relate to the provision, rehabilitation, or operation of housing and related facilities, *to take all action necessary and appropriate* to prevent discrimination because of race, color, creed, or national origin—

"(a) in the sale, leasing, rental, or other disposition of residential property and related facilities (including land to be developed for residential use), or in the use or occupancy thereof, if such properties and related facilities are—

*       *       *       *       *       *

"(ii) provided in whole or in part with the aid of loans, advances, grants, or contributions hereafter agreed to be made by the Federal Government. . .

*       *       *       *       *       *

"[Any executive department or agency subject to this order] may—

"(a) *cancel or terminate in whole or in part any agreement or contract with such person, firm, or State or local public agency providing for a loan, grant, contribution, or other Federal aid, or for the payment of a commission or fee;*

"(b) *refrain from extending any further aid under any program administered by it and affected by this order*

8. Section 3608(c) appears to be even broader in its intent: "All executive departments and agencies shall administer their programs and activities relating to housing and urban development in a manner affirmatively to further the purposes of this subchapter and shall cooperate with the Secretary to further such purposes."

*until it is satisfied that the affected person, firm, or State or local public agency will comply with the rules, regulations, and procedures issued or adopted pursuant to this order, and any nondiscrimination provisions included in any agreement or contract. . . ."*

Executive Order No. 11063 is a clear and broad directive to executive departments and agencies to take all action necessary and appropriate to achieve fair housing. One remedy for discrimination is the cutting off of funds "or *other* Federal aid" until nondiscrimination ceases.

Section 602 of the Civil Rights Act of 1964 (42 U.S.C. § 2000d–1) provides for the issuance of rules, regulations and orders of general applicability to be approved by the President, compliance with which may be effected "by the termination of or refusal to grant or to continue assistance" upon an express finding of failure of compliance after opportunity for a hearing. Termination or refusal "shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found."

This restrictive language by its terms applies only to a certain narrow kind of noncompliance—that is, failure to comply with a rule of general applicability approved by the President, upon an express finding after a hearing. In the course of the debate on the Civil Rights Act of 1964, Senator Humphrey said that Title VI, which includes section 602, "will not impair in any way the existing authority of the President, and the agencies administering these programs, to deal with problems of discrimination in them. . . . [Requirements that recipients of federal aid refrain from racial discrimination] are already in effect under Executive Order No. 11063. Hence Title VI will merely give statutory

support to the regulations already in effect as to these programs. . . ."[9] The broad remedies available under No. 11063 were not impaired as far as the executive departments and agencies were concerned.

In any event, section 602 does not apply to judicial remedies.[10] After analyzing similar restrictive language applying to school desegregation in the Civil Rights Act of 1964, the Supreme Court said in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 17, 91 S.Ct. 1267, 1277, 28 L.Ed.2d 554 (1971):

"There is no suggestion of an intention to restrict [the existing powers of federal courts to enforce the equal protection clause] or withdraw from courts their historic equitable remedial powers."

HUD itself has recognized that remedying racial discrimination is a prime objective of all the programs it administers.

The HUD program infected with racial bias in the *Gautreaux* cases is Low-Rent Housing (42 U.S.C. § 1401 et seq.). Section 205.1(g) of HUD's Low-Rent Housing Manual (1967) provides that "any proposal to locate housing only in areas of racial concentration will be *prima facie* unacceptable." In an appendix to the HUD Handbook of Policies and Requirements for Model Cities Relocation, HUD states:[11]

"It is the policy of the Department of Housing and Urban Development to require and to assure that no person shall on the grounds of race, color, or national origin be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination *under any program or activity receiving Federal assistance from HUD* (emphasis added)."

9. II Schwartz, Statutory History of the United States: Civil Rights 1217 (1970).

10. Board of Public Instruction v. Finch, 414 F.2d 1068, 1076 n. 13 (5th Cir. 1969): "The legislative history [of section 602] . . . makes perfectly clear that the requirements of the statute are directed exclusively at the administrative agency. . . ."

11. Department of Housing and Urban Development, CDA Letter No. 5, Policies and Requirements for Model Cities Relocation (Revised February 1970), appendix A, page 1.

The bridge or nexus between the program with racial bias and the different program where funds are cut off is much more substantial in this case than appears to be required by the broad language of Executive Order No. 11063 or the HUD handbooks.

The congressional declaration of purposes for the Comprehensive City Demonstration Program (Model Cities Program) states (42 U.S.C. § 3301):

"The purposes . . . are to provide additional financial and technical assistance to enable cities of all sizes (with equal regard to the problems of small as well as large cities) to plan, develop, and carry out locally prepared and scheduled comprehensive city demonstration programs containing new and imaginative proposals to rebuild or revitalize large slum and blighted areas; to expand housing, job, and income opportunities; to reduce dependence on welfare payments; to improve educational facilities and programs; to combat disease and ill health; to reduce the incidence of crime and delinquency; to enhance recreational and cultural opportunities; to establish better access between homes and jobs; and generally to improve living conditions for the people who live in such areas, and to accomplish these objectives through the most effective and economical concentration and coordination of Federal, State, and local public and private efforts to improve the quality of urban life."

Every comprehensive city demonstration program must include a relocation plan, which will assure that (42 U.S.C. § 3307 (a)):

" . . . relocation activities are coordinated to the maximum extent feasible with the increase in the supply of decent, safe, and sanitary housing for families and individuals of low or moderate income, as provided under the comprehensive city demonstration program, *or otherwise,* in order to best maintain the available supply of housing for all such families and individ-uals throughout the city (emphasis added)."

The HUD Model Cities Handbook (CDA Letter No. 5) states in paragraph 2(d):

"[The City Demonstration Agency] must coordinate its Program to the maximum extent feasible with other activities causing displacement in the city to avoid competition for the same housing units. HUD will expect each CDA to explain what it has done to bring about such coordination. There is no adequate substitute for the *public* responsibility to plan for, encourage and assist the construction of the necessary volume of low- and moderate-income housing."

Although the relocation plan under the Chicago Model Cities Program called for the displacement of only some 60 families, the relocation needs of the city "to maintain the July 1, 1969, housing supply level for low-income families" was 6,200 units, which HUD reduced to a minimum of 4,300 units, 1,700 of which were required to be supplied by December 15, 1971, under the Letter of Intention signed by the mayor of Chicago and by the heads of CHA and the regional HUD office.

HUD had administrative authority as well as statutory authority (42 U.S.C. § 3307(a)) to lump together all relocation needs within the city. The HUD Model Cities Handbook (CDA Letter No. 5) provides:

"The following actions are representative of the type of activities which should be undertaken by local agencies and the community in order to achieve the objective of equal opportunity in housing. . . .

"7. Make maximum use, as a re-housing resource, of housing covered by Title VI of the Civil Rights Act of 1964 and Executive Order 11063. . . ."

On oral argument, counsel for HUD conceded that HUD had the discretionary power to combine the City of Chicago's relocation housing needs and to condition funds for the second year of the Model

Cities Program, as well as funds for the second year of the Neighborhood Development Program, upon the city's supplying 4,300 relocation units of housing according to the timetable in the Letter of Intention.

I would agree that HUD had such power on the basis of the relocation provisions of the Model Cities statute and Executive Order No. 11063. Subsequently, HUD reversed its position and released the $26-million balance for the second-year Model Cities Program, but HUD did in fact cut off the second-year funds in the amount of $20 million for the Neighborhood Development Program because of the city's failure to provide the relocation units.

Whether HUD properly exercised its discretion in determining to release the $26-million Model Cities funds is not the subject of this appeal, although such exercise of discretion is reviewable in a proper case. Shannon v. United States Department of Housing and Urban Development, 436 F.2d 809, 819 (3rd Cir. 1970).[12]

In any event, for the purpose of this appeal it appears to me that, because HUD had the power to and did condition the release of funds for one program upon the observance of requirements for another program, the district court had a sound guideline to follow when he did the same thing. "There is of course no question that the Federal Government, unless barred by some controlling constitutional prohibition, may impose the terms and conditions upon which its money allotments to the States shall be disbursed. . . ." King v. Smith, 392 U.S. 309, 333 n. 34, 88 S.Ct. 2128, 2141, 20 L.Ed.2d 1118 (1968). Here the "constitutional prohibition" does not bar the withholding of funds; it tends to impel it.

A second guideline is balancing competing interests. "The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims." Hecht Co. v. Bowles, 321 U.S. 321, 329–330, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944).

The basic adjustment of equities here requires a balancing of the positive gains to poor and disadvantaged persons resulting from a disbursement of the Model Cities funds, as against the possible effectiveness of diminishing racially discriminatory housing by the withholding of those funds.

HUD has capsulized the dire results of stopping the funds in its brief: "[N]early 4,000 people would lose their jobs and Model Cities services to thousands of people would be halted. Eighteen day care centers serving 1,100 children would close; hot breakfasts and lunches for over 10,000 school children daily would be discontinued; teacher-training projects and construction of capital programs would be ended. . ."

The plaintiffs have pointed out that the second year of the Chicago Model Cities Program terminated on December 31, 1971, and the $26 million ordered by the district court would not affect services and programs already completed. I recognize, however, that without being reimbursed for the $26 million already spent, Chicago would be required to raise the lost funds either through increased taxation or by reducing other services in the future, most likely future Model Cities services. Nor does the fact that CHA and the City of Chicago "hold the key to the jailhouse door" and could solve the dilemma very simply by providing the required units of low-rent housing and thereby release the Model Cities funds, alter the stark reality that, if they do not elect to do so, completely innocent people will suffer.

Not everyone agrees on the priorities of the Model Cities Program beneficiaries. Amici in this case, the Chicago

12. "[That] discretion must be exercised within the framework of the national policy against discrimination in federally assisted housing . . . and in favor of fair housing."

Chapter and Operation Breadbasket of the Southern Christian Leadership Conference, have argued that "4,000 jobs now held by, and which may become lost to model area residents may not be the most crucial issue in this case; certainly not against a background of more than twenty years of deliberate and covert racial discrimination in housing . . . and . . . an invidious, conscious and concerted refusal by the . . . City of Chicago and CHA to now provide additional housing (which would also mean increased employment opportunity) for this City's Black and White low income families."

Although the district court's remedy may appear to be harsh and drastic when viewed in isolation, the problem it seeks to alleviate is crucial and monumental. The failure of HUD and CHA to provide *any* low-cost public housing for several years, in view of the city's huge housing deficit gauged as long ago as mid-1969, affects black and white alike. Lack of decent low-income housing is not only a major problem in itself,[13] but it is a prodigious spawner of problems for black and white equally: poverty, unemployment, illness, malnutrition, despair, family disunity, crime, violence and civil disorder.[14]

When there is added to the appalling problem of lack of low-income housing for everyone, the separate problem of racial discrimination, the amalgam requires priority status, emergency treatment and drastic if not "bizarre" remedies. The specific problem on which this appeal is focused is the increasing concentration of non-whites in the slums and ghettos of the inner city, where they are imprisoned by the "white suburban noose."[15] The prisoners of slums and ghettos endure not only substandard housing, but a higher incidence of death and disease, inferior schools, inferior job opportunities, inferior community services, inferior municipal services, "all amidst physical decay and psychological outrage."[16]

13. In establishing a committee on urban housing in 1967, the President characterized the need to provide a decent home for every family "now imprisoned in the squalor of the slums" as "the most pressing unfulfilled need in our society." Report of the President's Committee on Urban Housing A Decent Home (1968) ("Kaiser Report") 1. The committee found that in 30 years of federal housing subsidies, only 800,000 subsidized units were built and that the then-current rate of building was about 50,000 a year. It found the future need to be from 600,000 to 800,000 subsidized units per year for the next ten years. Id. at 8, 23, 47. The Commission on Urban Problems found with "a sense of urgency and even alarm" that "we must put housing on the front burner" and must "focus our housing programs on housing for poor people." Report of the National Commission on Urban Problems, Building the American City (1968) ("Douglas Report") 30. It found a need for 500,000 units a year for poor- and moderate-income families. Id. at 180.

14. The Advisory Commission on Civil Disorders identified inadequate housing as one of the prime components of the "explosive mixture" leading to civil disorders and recommended that "the supply of housing suitable for low-income families should be expanded" on a massive basis. Report of the National Advisory Commission on Civil Disorders (1968) ("Kerner Report") 5, 260. The Commission on the Causes and Prevention of Violence, in recommending more effective steps to realize "the 1968 Housing Act's goal of a decent home for every American within a decade" found that "the poverty and social isolation of minority groups in central cities is the single most serious problem of the American city today." Final Report of the National Commission on the Causes and Prevention of Violence, To Establish Justice, To Insure Domestic Tranquility (1969) ("Eisenhower Report") 49, 273.

15. Douglas Report, 1. "To date, housing programs serving low-income groups have been concentrated in the ghettos. Nonghetto areas, particularly suburbs, have for the most part steadfastly opposed low-income, rent supplement, or below-market interest rate housing, and have successfully restricted use of these programs outside the ghetto." Kerner Report, 263.

16. Comment "Public Housing and Integration: A Neglected Opportunity," 6 Columbia Journal of Law and Social Problems 253, 270 (1970).

For many years the public housing program and its federal and local administrators have contributed to the increasing segregation of the black inner city from the white suburbs [17] through discriminatory site selection,[18] ghetto high-rise monstrosities,[19] and pervasive foot-dragging.[20]

The focal problem of racial polarization is not confined to Chicago by any means; it is a national crisis.[21] The fact remains, however, that in this case CHA (296 F.Supp. 907) and HUD (448 F.2d 731) have been found guilty of deliberately fostering racial discrimination in Chicago.

The Model Cities Program is undoubtedly accomplishing much good. As the *Shannon* court said, "[T]here will be instances where a pressing case may be made for the rebuilding of a racial ghetto." Shannon v. United States Department of Housing and Urban Development, 436 F.2d 809, 822 (3rd Cir. 1970). But as Judge Duffy observed in an earlier *Gautreaux* opinion, "the situation before us now *already* has been held not to constitute such a pressing case, and such is the determinative factor." 448 F.2d at 740.

The idea of withholding federal funds from one program to enforce another is not entirely novel.[22] Two of the recommendations of the Douglas Commission were:

No. 7: "The Commission recommends that Congress amend the National Housing Act to change drastically the philosophy, methodology, and financial arrangements for Federal assistance in the provision of low-income housing, by adopting an active approach in dealing with localities."

No. 12: "The Commission recommends that the Congress enact legislation to provide that all financial assistance programs (including grants, loans, and loan guarantees) administered by the Department of Housing and Urban Development be conditioned upon the existence within the local government area being served of an enforceable open occupancy ordinance, or in lieu thereof, enforceable State legislation providing for open occupancy."[23]

The first recommendation was realized with the passage of the Civil Rights Act of 1968 (42 U.S.C. §§ 3601, 3608(d) (5)).

17. "Elected officials at all levels found it hard to stand up against the prevailing pressure for segregated neighborhoods. Those at the Federal level were no exception. For years they made little effort to resist the pressure. They closed their eyes to the massive federally supported building of largely white suburbia in the period following World War II." Douglas Report, 12.

18. Shannon v. United States Department of Housing and Urban Development, 436 F.2d 809 (3rd Cir. 1970). *See also* Comment, "Urban Housing," 46 New York University Law Review 560 (1971); Note, "Discriminatory Site Location and Tenant Allocation Procedures," 1970 Wisconsin Law Review 559 (1970); Note, "Discriminatory Site Selection in Public Housing and Federal Judicial Response," 64 Northwestern University Law Review 720 (1970).

19. Rockefeller Panel Reports, *Prospect for America* 303 (1961): "Our public housing programs have created many problems. They have crowded low income families, and especially minority groups, into high-density, many-storied apartments, thus intensifying economic segregation while breaking down constructive neighborhood relationships."

20. Douglas Report, 11.

21. Note, "Racial Discrimination in Public Housing Site Selection," 23 Stanford Law Review 63 (1970); Comment, "Public Housing and Integration: A Neglected Opportunity," 6 Columbia Journal of Law and Social Problems 253, 256 (1970); Note, "Low-Income Housing and the Equal Protection Clause," 56 Cornell Law Review 343 (1971).

22. Note, "Segregation and the Suburbs: Low-Income Housing, Zoning and the Fourteenth Amendment," 56 Iowa Law Review 1298, 1318–19 (1971); Buchanan, "Federal Regulation of Private Racial Prejudice: A Study of Law in Search of Morality," 56 Iowa Law Review 473, 513–22 (1971).

23. Douglas Report, 183, 186.

The power to accomplish the second was given by Executive Order No. 11063.

It should also be noted that the district court here was dealing with two programs administered by HUD, an approach which does not conflict with fears expressed in congressional debate on the Civil Rights Act of 1964 "that termination of aid to schools might also lead to termination of aid to roads and highways."[24]

Another guideline for the district court in fashioning a remedy was the fact that in this case HUD had failed to comply with the rules and regulations which it had itself promulgated.[25]

The final guideline is that "a district court's remedial decree is to be judged by its effectiveness." Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 25, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971). The Douglas Commission, in making recommendation No. 12 above, believed "it most unlikely that localities would prefer to do without Federal assistance rather than to enact and enforce open housing legislation."[26]

The district court here obviously believed that the remedy would be effective. He said that he would "sugar-coat the pill" to make it attractive to Chicago by requiring the approval of only half as many units as the amount reasonably needed to recapture the Model Cities funds. Gautreaux v. Romney, 332 F. Supp. 366, 370 (N.D.Ill.1971).

The district court has been hearing this controversy on virtually a day-to-day basis since 1966. His past efforts at molding a remedy have been cautious; in 1969 he abjured from employing a "drastic kind of relief—that of enjoining the use of federal funds." 296 F.Supp. at 915. Since then, his orders have been ignored and his efforts frustrated. In our last opinion in this case, we deferred to his "wise discretion," although we cautioned against "granting a broad license for interference with the programs and actions of an already beleaguered federal agency." 448 F.2d at 740.

The district court's past remedies have proved to be wise and at least partially effective. For example, his July 1, 1969 order provided for scattered-site, low-rise housing. Experts agree that these are now mandatory requirements of new public housing.[27] Prompted by his order, Chicago and the CHA having made verbal commitments to scattered-site housing; the City Council has approved sites for 288 such units. I believe the court should accept the district court's judgment that his latest order will further the cause of non-discriminatory public housing.

There is no indication at all that, if tomorrow it became necessary to adjust or amend or recall today's remedy, the district court would not respond carefully and prudently.

Because under the facts in this case, use of Model Cities funds seems to derogate the policy of racial non-discrimination by attempting to enrich the ghetto instead of striving to eliminate it through dispersal of its inhabitants, it appears to me that the district judge did not abuse his discretion in fashioning this remedy.

I would affirm the judgment.

24. Board of Public Instruction v. Finch, 414 F.2d 1068, 1077 (5th Cir. 1969). In that case, in order to promote school desegregation (a policy HEW was committed to execute), HEW cut off funds " 'arising under any Act of Congress' administered by HEW, the National Science Foundation, and the Department of the Interior." Id. at 1071. The importance of having all housing programs administered by HUD in order to promote uniform congressional housing policy was emphasized by the Kaiser Commission. Kaiser Report, 72.

25. Thorpe v. Housing Authority, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969) ; Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (2d Cir. 1968). See also Judge Irving R. Kaufman, "Judicial Review of Agency Action: A Judge's Unburdening," 45 New York University Law Review 201, 203–04 (1970).

26. Douglas Report, 186.

27. Kerner Report, 262–63, Douglas Report, 188.