Dorothy **GAUTREAUX** et al., Plaintiffs,

v.

The **CHICAGO HOUSING AUTHORITY** et al., Defendants.

No. 66 C 1459.

United States District Court
N. D. Illinois, E. D.

Feb. 10, 1969.

Alexander Polikoff, Charles R. Markels and Bernard Weisberg, Chicago, Ill., for plaintiffs.

Kathryn M. Kula, John W. Hunt, and James T. Otis, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

AUSTIN, District Judge.

Plaintiffs, Negro tenants in or applicants for public housing, sue on behalf of themselves and all others similarly situated alleging that defendants, the Chicago Housing Authority (CHA), a municipal corporation, and C. E. Humphrey, Executive Director of CHA, have violated their rights under the Fourteenth Amendment of the Constitution of the United States. Count I charges that defendants intentionally chose sites for family public housing and adopted tenant assignment procedures in violation of 42 U.S.C. Secs. 1981 and 1983 for the purpose of maintaining existing patterns of residential separation of races in Chicago. Count III alleges that regardless of their intentions defendants violated 42 U.S.C. Secs. 1981 and 1983 by failing to select family public housing sites in such locations as would alleviate existing patterns of residential separation. Counts II and IV repeat the allegations in Counts I and III respectively and demand relief under 42 U.S.C. Sec. 2000d (Section 601 of Title VI of the Civil Rights Act of 1964).

On March 2, 1967 this court denied defendants' motion to dismiss for failure to state a claim upon which relief can be granted as to Counts I and II and granted the motion as to Counts III and IV, 265 F.Supp. 582. Plaintiffs' remaining requests for relief include (1) a declaratory judgment pursuant to 28 U.S.C. Secs. 2201 and 2202 that defendants have selected sites in violation of plaintiffs' constitutional rights, (2) a permanent injunction against the racially discriminatory aspects of the public housing system, (3) an order directing defendants to submit and carry out a plan for selection of future sites to eliminate these discriminatory aspects, and (4) a declaratory judgment that

plaintiffs have the right under 42 U.S.C. Sec. 2000d to end the use of federal funds to perpetuate the racially discriminatory aspects of the public housing system and an injunction against such use. Since March 2, 1967 the parties have amassed thousands of pages of depositions, affidavits and exhibits. Both parties now move for summary judgment on Counts I and II.

## I. Discriminatory Tenant Assignment Practices.

· Plaintiffs charge that defendants have imposed quotas at four White family housing projects to keep the number of Negro families to a minimal level.

The Trumbull, Lathrop, Lawndale and Bridgeport projects were built before 1944 in areas which were then and are now substantially all White. Baron Affidavit, Exhibit A. Until 1954 CHA refused to permit Negro families to reside in these projects. Statement of Elizabeth Wood, Head of CHA until August 23, 1954. The Negro population in the four projects on December 31, 1967 represented respectively about 7%, 4%, 6% and 1% of the total. Stipulation, July 29, 1968. At present Negroes comprise about 90% of the tenants in CHA family housing projects and about 90% of the waiting list of 13,000 persons. CHA Sept. 20 Brief, p. 7, p. 18.

The disparity between the low number of Negro families in these projects and the high number of Negro applicants for all projects indicates that CHA has imposed a Negro quota. Alvin Rose, Executive Director (chief executive officer) of CHA from September 1957 to November 1967, testified on deposition that CHA devised "elastic quotas" (p. 173) at the four projects which can more accurately be characterized as "fixed" (p. 180). Harry Schneider, Deputy Executive Director of CHA, formerly Director of Management from May 1950 to January 1968, testified that until May 22, 1968 these four projects were listed on CHA tenant selection forms as appropriate for "A families only," that is, Whites only. Schneider Dep.,

p. 77. He states that in these projects there are "controls" on the number of Negro applicants accepted (p. 75), that Negro population in these projects is now "fairly close" to the "appropriate maximum number" (p. 78), and that if, for example, Trumbull attained the level of 35 Negro families a "hold" would maintain the occupancy at that level (p. 84.) Mrs. Louise Webb, in charge of processing tenant applications for CHA, confirms Mr. Schneider's testimony that quotas are now in force. Webb Dep., p. 61.

CHA does not contradict these statements of its own officials. The "history of tension, threats of violence and violence" urged in justification by CHA cannot excuse a governmentally established policy of racial segregation. Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958). In fact, the only violent incident mentioned by Mr. Schneider occurred in 1953, and Mr. Rose recalled that one incident indicating White hostility to Negroes occurred at Bridgeport in 1959. Schneider Dep., p. 63; Rose Dep., p. 163. Precautions taken in the wake of these incidents such as notifying the police and Human Relations Commission are no longer taken when Negroes are moved into the White projects. Schneider Dep., p. 82. These remote incidents do not show a clear threat of violence which might justify quotas as a very temporary expedient. In any case, CHA's quotas clearly have maintained Negro occupancy at a permanently low level. Therefore, plaintiffs are entitled to appropriate relief against the defendants' policy of denying applications to the four projects on the basis of racial quotas. Detroit Housing Commission v. Lewis, 226 F.2d 180 (6th Cir. 1955).

## II. Discriminatory Site Selection Procedures

In choosing sites for public housing, the CHA is directed by statute to follow these criteria:

[E]limination of unsafe and unsanitary dwellings, the clearing and

redevelopment of blighted and slum areas, the assembly of improved and unimproved land for development or redevelopment purposes, the conservation and rehabilitation of existing housing, and the provision of decent, safe, and sanitary housing accomodations.

Ill.Rev.Stat., Ch. 67½, Sec. 8.2.

The City Council must approve all sites before they are acquired. Ill.Rev.Stat., Ch. 67½, Sec. 9. However, CHA is not compelled to acquire or build upon all sites thus approved. Humphrey Dep., p. 107.

Plaintiffs charge that the procedure mainly used by defendants to maintain existing patterns of racial residential separation involved a pre-clearance arrangement under which CHA informally submitted sites for family housing to the City Council Alderman in whose ward the site was located. CHA admits the existence of this procedure. E. g., Humphrey Aff't., p. 7. The Alderman to whom White sites were submitted allegedly vetoed these sites because the 90% Negro waiting list and occupancy rate would create a Negro population in the White area. Plaintiffs allege that the few White sites which escaped an Alderman's informal veto were rejected on racial grounds by the City Council when they were formally submitted by CHA for approval.

## A. Statistics on Sites Considered and Selected.

As of July, 1968, CHA had in operation or development 54 family projects at 64 sites in Chicago consisting of 30,-848 units. CHA Sept. 20 Brief, p. 7, (adopting figures in Baron Aff't. submitted by plaintiffs). Exclusive of the four segregated White projects, CHA's family housing tenants are 99% Negroes. Stipulation, July 29, 1968. Exclusive of

the four projects, housing units now located in neighborhoods[1] between 50% and 100% Negro represent 99½% of the total units operated by CHA; units in neighborhoods between 75% and 100% Negro are 92% of the total; and units in areas over 95% Negro are two-thirds of the total. Baron Aff't., Ex. A A glance at a map depicting Negro areas of residence in Chicago confirms that the 50% to 90% Negro areas are almost without exception contiguous with 90% to 100% Negro areas and that the relatively small numbers of Chicago Negroes not concentrated in the over 90% areas are almost entirely concentrated in the over 50% areas. Baron Aff't., Ex. F. Therefore, given the trend of Negro population movement, 99½% of CHA family units are located in areas which are or soon will be substantially all Negro. Baron Aff't., Ex. G. It is incredible that this dismal prospect of an all Negro public housing system in all Negro areas came about without the persistent application of a deliberate policy to confine public housing to all Negro or immediately adjacent changing areas.

To sustain their burden of proving that defendants' past and present policies have deprived them of their constitutional rights, plaintiffs contend that, during the consideration of each of the five major family housing programs since 1954, White sites meeting all appropriate criteria were rejected for racial reasons. Mr. Humphrey's affidavit sets forth (a) the total number of sites initially selected by CHA which met criteria of slum clearance, cost limitations, accessibility to public facilities, and overall metropolitan planning (b) White sites initially selected which met these same criteria (c) the number of apartment units planned for the White sites initially selected as a

---

[1]. Both parties adopt as accurate representations of Chicago's current neighborhoods the census tracts derived from the 1960 Census of Population and Housing, Chicago, published by U.S. Bureau of Census. Baron Aff't.; Humphrey Aff't. Chicago consists of 935 compact census tracts with a population of relatively uniform characteristics averaging 4,000 people. The census figures classify the races as White and Non-White, but both parties use the Non-White figure to represent Negroes since 97% of Chicago's Non-Whites are Negroes.

percentage of the total apartment units planned for all sites selected, (d) White sites finally approved by the City Council, and (e) Negro sites approved.

| | (a) Sites Initially Selected | (b) White Sites Initially Selected | (c) Per Cent of Units in White Sites Initially Selected | (d) White Sites Approved | (e) Negro * Sites Approved |
|---|---|---|---|---|---|
| 1955 Program | 25 | 4 | 45% | 0 | 19 |
| 1956 Program | 11 | 4 | 30% | 0 | 5 |
| 1958 Program | 11 | 2 | 31% | 0 | 7 |
| 1965 Program | 18 | 9 | 50% | 0 | 9 |
| 1966 Program | 38 | 22 | 50% | 2 | 9 |

* The sites classified by Mr. Humphrey as in Negro neighborhoods were primarily in over 95% Negro neighborhoods, but a few sites so classified were in neighborhoods which were ⅓ White.

Mr. Humphrey estimates that the sites selected initially by CHA for the five programs totalled 7,883 White housing units and 10,901 Negro units for a total of 18,784 units. One of the two White sites finally approved in 1966 included 400 units and was located on vacant land bounded on one side by a predominantly Negro area and partially occupied by dilapidated Negro shacks. Humphrey Dep. II, p. 190. The mere fortuity that this site was included in a 72.8% White census tract does not make it relevant to negate the inference of a policy against choosing sites in White neighborhoods. The other White site approved in 1966 was planned for 36 units. CHA did not proceed formally to submit for City Council approval seven White sites in 1965 because "the Aldermen in whose Wards those sites were located advised of community opposition and indicated they were opposed to such sites in their Wards." Humphrey Aff't., p. 6. One White site in the 1965 program was not submitted to the City Council because the City Department of Development and Planning advised against its acquisition, presumably because it conflicted with other urban planning projects. The only White site formally submitted was dropped from consideration by the City Council Committee on Planning and Housing. In 1966 the Department of Development and Planning advised against all 20 of the White sites not formally submitted because it "either (a) disapproved the site, (b) recommended deferment of (c) advised of Aldermanic opposition." Humphrey Aff't., p. 9. Since the Department merely assumed CHA's admitted former role in the pre-clearance procedure, it must be inferred in the absence of a suggestion to the contrary by defendants that only a minimal number of White sites in 1966 were disapproved because they conflicted with other urban development projects.

Additional family sites not included in the five programs were developed in 1963 in a Negro neighborhood (346 units) and in 1965 in two White neighborhoods (12 units). CHA also operates 5,050 units of public housing for elderly persons of which 54½% are in substantially White neighborhoods. Fifty-seven per cent of 2,047 elderly housing units presently in development are in White neighborhoods. The Illinois

statutory procedures applying to family housing projects, including the requirement of City Council approval, apply also to elderly housing projects. (Plaintiffs' Complaint is not directed to elderly housing.) But the relatively equal distribution between White and Negro elderly housing sites actually developed arises from circumstances which are not applicable to family housing sites. In selecting tenants for elderly housing Mr. Rose conceived a "proximity rule" under which the applications of persons living within a two block radius of the site of an elderly housing project were granted priority and successive priorities were given to persons living within concentric half mile circles. Rose Dep., p. 196. The "proximity rule" helped "very obviously" to obtain an Alderman's approval because it was a "fair assumption" that a White site would be occupied by Whites. Rose Dep., p. 197. CHA abandoned the "proximity rule" after the Commissioner of Public Housing Administration informed CHA that enforcement of the "proximity rule" would result in loss of federal funds. Letter of December 11, 1963, Rose Dep., Ex. 4. Before abandonment of the "proximity rule" the selection of elderly housing sites in White areas was consistent with a policy against placing Negroes in White neighborhoods, and after its abandonment a change to a policy of selecting all Negro sites would almost certainly have resulted in a loss of federal funds. Therefore, the circumstances surrounding the choice of sites for elderly housing tend to prove a purpose to perpetuate racial separation rather than to refute it. The mix of White and Negro elderly housing sites is not relevant except to show (as does the nearly identical mix between White and Negro family sites initially selected by CHA) what would probably have happened in the absence of a policy of eliminating White sites on racial grounds.

No criterion, other than race, can plausibly explain the veto of over 99½% of the housing units located on the White sites which were initially selected on the basis of CHA's expert judgment and at the same time the rejection of only 10% or so of the units on Negro sites.

B. Testimony on Site Selection Criteria.

High CHA officials clearly understood the message of the statistics, and with commendable frankness some of them said so. While Executive Director, Mr. Rose testified in 1959 before the U. S. Commission on Civil Rights:

"Q Because of the present location of the existing sites, then, the Council of Chicago is guilty of practicing to a certain degree segregated housing, is that true?

A You are only agreeing with me.

Q Well, somebody is guilty of contributing to the segregation of housing of people in the City of Chicago, because when you look at the present location of the housing projects, they are predominately within the Negro area.

A That is true."

Rose Dep., p. 9.

On July 16, 1966, Mr. Humphrey, who was then Deputy Executive Director, responded to a question from an Alderman in testimony before the City Council:

"Q And did he then ask you why the Housing Authority hadn't presented any sites outside the segregated Negro neighborhoods?

A I think he asked that question, yes.

Q And did you answer that the reason was you couldn't find any suitable sites outside the Negro neighborhoods?

A I didn't answer it that way at all.

Q What answer did you give?

A I answered it to the effect that he knew as well as I as to why we didn't have other sites; that he knew that if the site was approved by the alderman that it was included in the package and

if it wasn't approved it wasn't included, and I added to that, incidentally, there are none in the package from your ward."

Humphrey Dep., p. 133.

Mrs. Kathryn Moore, General Counsel of CHA, stated that in her opinion land in White areas equally suitable for development and often cheaper than land in Negro areas was unavailable solely because of the requirement of City Council approval. Moore Dep., p. 18 and Ex. 5.

CHA follows an unvarying policy "based upon actual experience in submitting sites to the City Council for approval" of informally clearing each site with the Alderman in whose Ward the site is located and eliminating each site opposed by an Alderman. Humphrey Aff't., p. 7; Humphrey Dep. I, p. 100; Rose Dep., p. 59. (There is some confusion whether the White sites eliminated from the 1955, 1956 and 1958 programs were formally submitted to the City Council or informally vetoed. Cf. Humphrey Aff't., pp. 4–6, with Humphrey Dep. I, pp. 98–100.) The statements of Mr. Humphrey and Mr. Rose quoted above indicate that they personally knew that this procedure would result in the veto on racial grounds of substantial numbers of White sites. Mr. Humphrey also stated on deposition:

"Q  Was the reason actually that you knew the City Council would probably not approve public housing sites in white neighborhoods?

A  I said no doubt, there.

Q  You mean that was no doubt the case?

A  Well, I am assuming from what had been going on the last few years that you just couldn't go anywhere in the City of Chicago that you wanted to and acquire a site.

Q  Particularly in the white neighborhoods, I take it?

A  Right."

Humphrey Dep. II, p. 204.

An uncontradicted affidavit claims that Mr. Charles Swibel, Chairman of the Board of Commissioners of CHA, stated in private conversations on numerous occasions that the City Council had CHA "over a barrel" and consequently CHA acquiesced in choosing sites in Negro neighborhoods. Berry Aff't. Since CHA directly denies none of these statements or numerous other statements to a similar effect cited in Plaintiffs' briefs, there is no genuine issue as to the truth of the fact that the pre-clearance procedure was known by CHA to result in the veto of substantial numbers of sites on racial grounds.

C.  Legal Consequences of the Site Selection Policies.

On March 2, 1967 this court ruled that "plaintiffs, as present and future users of the system, have the right under the Fourteenth Amendment to have sites selected for public housing projects without regard to the racial composition of either the surrounding neighborhood or of the projects themselves." 265 F.Supp. 582, 583. The statistics on the family housing sites considered during the five major programs show a very high probability, a near certainty, that many sites were vetoed on the basis of the racial composition of the site's neighborhood. In the face of these figures, CHA's failure to present a substantial or even a speculative indication that racial criteria were not used entitles plaintiffs to judgment as a matter of law. Jones v. Georgia, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967) (finding of discrimination based entirely on jury selection statistics and absence of explanation); Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954) (same). The additional evidence of intent, composed mostly of uncontradicted admissions by CHA officials, also establishes plaintiffs' right to judgment as a matter of law either considered alone or in combination with the statistics. Cypress v. Newport News General and Nonsectarian Hospital Assn., 375 F.2d 648 (4th Cir. 1967).

Defendants urge that CHA officials never entertained racist attitudes and that "the racial character of the neighborhood has never been a factor in CHA's selection of a suitable site." Humphrey Aff't., p. 2. In view of CHA's persistent selection of White sites at the initial stage before the pre-clearance procedure and the candor of its officials on deposition, these statements are undoubtedly true. It is also undenied that sites for the projects which have been constructed were chosen primarily to further the praiseworthy and urgent goals of low cost housing and urban renewal. Nevertheless, a deliberate policy to separate the races cannot be justified by the good intentions with which other laudable goals are pursued. Brown v. Board of Education of Topeka, Shawnee County, Kansas, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). It is also true that there is no evidence that the Aldermen who vetoed White sites were necessarily motivated by racial animus when they followed a policy of keeping Negroes out of White neighborhoods. Most Aldermen apparently talked to their constituents and received unfavorable reactions before exercising their informal vetoes. Humphrey Dep. I, pp. 116–117; Rose Dep., p. 59. But even if the Aldermen's informal surveys were correct in their uniform assessment of public opinion, they cannot acquiesce in the sentiment of their constituents to keep their neighborhoods White and to deny admission to Negroes via the placement of public housing. U. S. v. School District 151, 404 F.2d 1125, (7th Cir. Dec. 17, 1968), at p. 11 of the slip sheet opinion; cf. Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967).

CHA finally contends that the impulse originating and sustaining the policy against choosing White sites came from the City Council. But by incorporating as an automatic step in its site selection procedure a practice which resulted in a racial veto before it performed its statutory function of formally presenting the sites to the City Council, CHA made those policies its own and deprived opponents of those policies of the opportunity for public debate. It is no defense that the City Council's power to approve sites may as a matter of practical politics have compelled CHA to adopt the pre-clearance procedure which was known by CHA to incorporate a racial veto. In fact, even if CHA had not participated in the elimination of White sites, its officials were bound by the Constitution not to exercise CHA's discretion to decide to build upon sites which were chosen by some other agency on the basis of race. Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); Orleans Parish School Board v. Bush, 268 F.2d 78 (5th Cir. 1959). See also U. S. v. School District 151, supra, in which the court observed at footnote 7, "There is no doubt that Board members were under severe pressure from District residents and that performance of duty was made difficult. But this cannot excuse the unconstitutional conduct justifiably found on this record." Although neither the City Council nor its members individually are parties to this suit, they will be bound by any order entered in this case against CHA of which they have actual notice. FRCP 65(d).

III.   Relief.

Plaintiffs' motion for summary judgment is granted on Count I; defendants' motion is denied.

A final judgment embracing all claims for relief shall not be entered for 30 days. During that time the parties should attempt to formulate a comprehensive plan to prohibit the future use and to remedy the past effects of CHA's unconstitutional site selection and tenant assignment procedures. If the parties cannot agree, each party shall submit a proposed judgment order.

Summary judgment is denied as to both parties on Count II. Although this court held on March 2, 1967 that Count II states a claim upon which relief can be granted under 42 U.S.C. Sec. 2000d (Section 601 of Title VI of the Civil Rights Act of 1964), judgment on Count

II would, in the context of this case, determine the propriety of granting a narrow, drastic kind of relief—that of enjoining the use of federal funds. The Public Housing Administration has already taken a position against denying federal funds in reply to a rather scanty presentation protesting the selection of a few sites on the basis of racial composition of their neighborhoods. Letter of October 14, 1965 from Marie C. McGuire, Commissioner of PHA, to Rev. Jerome Hall of the West Side Federation, Swibel Dep., Ex. 3. In addition to the uncertainty of whether PHA would hold it appropriate to deny funds under the facts as they are now known, it is not clear whether even a temporary denial of federal funds would not impede the development of public housing and thus damage the very persons this suit was brought to protect. The use of a threatened denial of funds to coerce compliance with the Constitution, if coercion is necessary, would seem to be a less efficient remedy than an injunction available under Count I. Therefore, summary judgment is denied without precluding plaintiffs from showing on the basis of more facts that denial of federal funds is an appropriate form of relief.

Two further results of CHA's participation in a policy of maintaining existing patterns of residential separation of the races must be mentioned. First, as Dr. Baron's Affidavit discloses, the 188,000 White families eligible for public housing have understandably chosen in the main to forego their opportunity to obtain low cost housing rather than to move into all Negro projects in all Negro neighborhoods. This is an ironic but predictable result of a segregationist policy of protecting Whites from less than half as many (76,000) eligible Negro families. Second, existing patterns of racial separation must be reversed if there is to be a chance of averting the desperately intensifying division of Whites and Negroes in Chicago. On the basis of present trends of Negro residential concentration and of Negro migration into and White migration out of the central city, the President's Commission on Civil Disorders estimates that Chicago will become 50% Negro by 1984. By 1984 it may be too late to heal racial divisions.