480 F.2d 210
 Dorothy GAUTREAUX et al., Plaintiffs-Appellees,
v.
CITY OF CHICAGO and Richard J. Daley, Defendants-Appellants,
v.
Fred B. ROTI et al., Members of the City Council of the City
of Chicago, Defendants-Appellants,
v.
Edward R. VRDOLYAK, Defendant-Appellant,
v.
CHICAGO HOUSING AUTHORITY, Defendant-Appellant.
 Nos. 72-1409, 72-1410, 72-1485 and 72-1486.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 12, 1973.
Decided May 18, 1973.
 
 Patrick W. O'Brien, Edward T. Joyce, Richard L. Curry, Corp. Counsel, William R. Quinlan, James R. Thompson, U.S. Atty., William T. Huyck, Chicago, Ill., for defendants-appellants.
 Alexander Polikoff, Alex Elson, Chicago, Ill., for plaintiffs-appellees.
 Before SWYGERT, Chief Judge, and PELL and SPRECHER, Circuit Judges.
 SPRECHER, Circuit Judge.
 
 
 1
 This chapter in a long unfinished story deals with the power and propriety of the district court's implementation of prior judgments which were designed to alleviate racial discrimination in site selection and tenant assignment procedures in public housing, by restructuring the local decision-making process in order to bypass a discriminatory bottleneck in that process.I
 
 
 2
 The facts of this case have been recited so often that a brief summary will suffice at this juncture. Black tenants in and applicants for public housing brought suit in 1966 against the Chicago Housing Authority (CHA) and others challenging the constitutionality of CHA's site selection policy. Preliminary motions by the defendants to dismiss and for summary judgment were disposed of in 1967. D.C., 265 F.Supp. 582. Plaintiffs' motion for summary judgment, on the other hand, was granted in 1969. D.C., 296 F.Supp. 907. That judgment was implemented later in the year by entry of an order which comprised a comprehensive plan for site selection. D.C., 304 F.Supp. 736. CHA submitted no sites for family dwelling units to the City Council of Chicago for approval and consequently the prior orders were further implemented in 1970 by a timetable and deadline order, which was affirmed by this court in Gautreaux v. Chicago Housing Authority, 436 F.2d 306 (7th Cir. 1970), cert. denied, 402 U.S. 922, 91 S.Ct. 1378, 28 L.Ed.2d 661 (1971).
 
 
 3
 The same plaintiffs, simultaneously with the filing of the CHA complaint in 1966, also filed another complaint against the Secretary of the Department of Housing and Urban Development (HUD) seeking declaratory and injunctive relief. The district court dismissed all four counts of the complaint but this Court reversed that judgment as to two counts, holding that HUD had violated the due process clause of the Fifth Amendment by assisting in carrying on a racially discriminatory public housing system in the Chicago area and entitling the plaintiffs to summary judgment. Gautreaux v. Romney, 448 F.2d 731 (7th Cir. 1971).
 
 
 4
 While the CHA and HUD cases were resulting in determinations that both agencies were guilty of unconstitutional racial discrimination in public housing site selection, HUD was approving annual money grants to the City of Chicago under the Model Cities Program established by the Domonstration Cities and Metropolitan Development Act of 1966 (42 U.S.C. Sec. 3301 ff.). The first year grant of $38 million was paid by HUD to Chicago but in 1971 the district court enjoined HUD from paying any second-year Model Cities Program money unless and until at least 700 dwelling units in white areas had received City Council approval. D.C., 332 F.Supp. 366. This order was reversed and remanded by this court with one judge dissenting. Gautreaux v. Romney, 457 F.2d 124 (7th Cir. 1972).
 
 
 5
 On April 10, 1972, the district court found, among other things, that acquisition of sites by CHA is necessary to enable CHA to comply with the 1969 judgment order to increase the supply of dwelling units as rapidly as possible; that under state law (Ill.Rev.Stat. ch. 67 1/2, Sec. 9) CHA may not acquire sites without City Council approval; that there was no showing of any necessity or reason for the failure of the City Council to take any action since July 1, 1971 to approve any acquisitions of proposed sites, particularly in light of the evidence that many of the sites were suitable for the provision of dwelling units; and that such failure had had the effect of preventing CHA from complying with the 1969 judgment order and of preventing the Court from assuring that relief to which the plaintiffs were entitled was provided. The Court ordered that until further order the statute requiring City Council approval of CHA sites shall not be applicable to CHA's actions taken for the purpose of providing dwelling units and directed CHA to proceed with appropriate steps to provide the 1500 dwelling units that were the subject of the District Court's July 20, 1970 and subsequent orders. 342 F.Supp. 827.
 
 
 6
 Appeals were taken by the City, the Mayor, CHA and 39 of the 48 aldermanic defendants. Five of the nonappealing aldermanic defendants (Aldermen Cousins, Despres, Langford, Simpson and Singer) admitted all allegations of the supplemental complaint involved here, took the position in the court below that they "fully support the efforts being made by the plaintiffs' and unsuccessfully sought leave to file a brief on this appeal in support of the order entered below. Four others (Aldermen Hedlund, Hoellen, Lawlor and Simon) have likewise not appealed. In addition, Alderman Holman, who is one of the appellants, while dissatisfied with the provisions of the 1969 judgment order, said,
 
 
 7
 "I would say that the Court enter an order that whether we have City Council approval or not, that we proceed . . . . The prayer to by-pass the City Council is one for the Court's suggestion, and I do not quarrel with it . . . ."
 
 
 8
 HUD has not appealed. In its answer to the supplemental complaint HUD said:
 
 
 9
 "[HUD] suggests that the inclusion of the City of Chicago, Richard J. Daley, Mayor of the City of Chicago, and individual members of the City Council, as defendants herein, is appropriate to achieve just and equitable relief and urges this Court to enter such order or orders against the aforesaid defendants as this court deems just and equitable."
 
 
 10
 The City, Mayor and appellant aldermen have contended (1) that it was improper to join them as parties-defendants for purposes of relief inasmuch as they have not been found to have violated any of plaintiff's rights nor have their objectives in the location of public housing been found to be unconstitutional; (2) that the City Council's authority to approve public housing sites does not deny plaintiffs any relief to which they are entitled; and (3) that both the order appealed from and the original 1969 judgment constitute abuses of discretion because of the hardships they introduce.
 
 
 11
 CHA has contended that the order is an abuse of discretion because it "promises to do nothing but add to CHA's already awesome burdens while contributing nothing to the complex problem of providing integrated public housing opportunities in the Chicago area."
 
 II
 
 12
 "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971).
 
 
 13
 It has long been conclusively established in this case (1) that "plaintiffs, as present and future users of the system, have the right under the Fourteenth Amendment to have sites selected for public housing projects without regard to the racial composition of either the surrounding neighborhood or of the projects themselves," 265 F.Supp. 582, 583; (2) that CHA had violated the Fourteenth Amendment by intentionally choosing sites for family public housing and adopting tenant assignment procedures for the purpose of maintaining existing patterns of residential separation of races, 296 F.Supp. 907, enforced by 304 F.Supp. 736, affirmed in 436 F.2d 306 (7th Cir. 1970), cert. denied, 402 U.S. 922, 91 S.Ct. 1378, 28 L.Ed.2d 661 (1971); and (3) that HUD had violated the due process clause of the Fifth Amendment by its knowing acquiescence in CHA's discriminatory housing program. 448 F.2d 731 (7th Cir. 1971).
 
 
 14
 The rights and violations are firmly established and are far beyond appeal or dispute. What remains is the district court's task "to correct, by a balancing of the individual and collective interests, the condition that offends the Constitution." Swann v. Charlotte-Mecklenburg Board of Education, supra, 402 U.S. at 16, 91 S.Ct. at 1276. This has proved to be a Herculean task requiring both the wisdom of Solomon and the patience of Job. See Gautreaux v. Romney, 457 F.2d 124 (7th Cir. 1972) (court's opinion, 124-129, and dissent, 129-140).
 
 
 15
 As early as in his opinion of February 10, 1969, supporting an order of the same date, the district court found that:
 
 
 16
 "CHA follows an unvarying policy 'based upon actual experience in submitting sites to the City Council for approval' of informally clearing each site with the Alderman in whose Ward the site is located and eliminating each site opposed by an Alderman." 296 F.Supp. at 913.
 
 The court further found (at 914):
 
 17
 "It is also true that there is no evidence that the Aldermen who vetoed White sites were necessarily motivated by racial animus when they followed a policy of keeping Negroes out of White neighborhoods. Most Aldermen apparently talked to their constituents and received unfavorable reactions before exercising their informal vetoes.
 
 
 18
 ******
 
 
 19
 * * *
 
 
 20
 "CHA finally contends that the impulse originating and sustaining the policy against choosing White sites came from the City Council. But by incorporating as an automatic step in its site selection procedure a practice which resulted in a racial veto before it performed its statutory function of formally presenting the sites to the City Council, CHA made those policies its own and deprived opponents of those policies of the opportunity for public debate. It is no defense that the City Council's power to approve sites may as a matter of practical politics have compelled CHA to adopt the pre-clearance procedure which was known by CHA to incorporate a racial veto. . . . Although neither the City Council nor its members individually are parties to this suit, they will be bound by any order entered in this case against CHA of which they have actual notice. FRCP 65(d)."
 
 
 21
 There was no appeal from these findings and conclusions and they became final. A supplemental complaint was filed by the plaintiffs on February 2, 1972, naming the Mayor and members of the City Council as parties-defendant. Answers were filed by the defendants and a hearing was held on the supplemental complaint, commencing April 4, 1972.
 
 
 22
 No evidence was offered at the hearing by the defendants to explain why neither the Planning and Housing Committee nor the City Council itself had given any consideration to the available CHA sites since July 1, 1971. Alderman Kelley, the only alderman called as a witness by the City, said under cross-examination that he had not discussed that subject with his fellow aldermen. Alderman Holman, testifying in his own behalf, was asked on cross-examination for his opinion as to why the committee had taken no action on CHA sites since July 1, 1971. He said he could not give an opinion, but then added:
 
 
 23
 "I don't think you could get, right now, an affirmative 26 votes [a majority of the council] to put that many housing units in white neighborhoods."
 
 
 24
 Alderman Simon regretted that the Committee hearings did not continue and said that the Council did a "great disservice" by not continuing with them. HUD called the "refusal" to hold further hearings "a deliberate affront to this [the district] court," and "totally contrary" to representations made by the City in the May 12, 1971 Letter of Intent signed by the City, CHA and HUD. See Gautreaux v. Romney, supra, 457 F.2d at 132.
 
 
 25
 A witness for the City, who was an assistant commissioner of the City's Department of Development and Planning (DDP), testified about an examination he and his staff had made of some (but not all) of the remaining CHA sites. Contrary to the City's statement that all of these sites "were shown to be in violation of the Chicago Zoning Ordinance, or otherwise burdensome upon public services, including school attendance," the evidence showed that the DDP staff found over 100 of them to be "suitable sites in the General Public Housing Area." However, neither this nor any other information or recommendation concerning the remaining CHA proposed sites was submitted by the DDP to the Chicago Plan Commission, the agency to which the DDP normally made its recommendations. No explanation was given as to why that had not been done. At the conclusion of the hearing, on April 10, 1972, the order now appealed from was entered.
 
 
 26
 The order found that pursuant to prior order of the Court, CHA submitted on March 5, 1971 to the defendant members of the City Council proposed sites for not fewer than 1500 dwelling units; that since July 1, 1971, neither the City nor the Council has approved the acquisition of any property by CHA for dwelling units; that many of the sites for the 1500 units are suitable for dwelling units; and that such failure to conduct hearings and approve acquisition has the effect of preventing CHA from providing additional Dwelling Units in conformity with the Judgment Order, thereby denying relief to the plaintiffs to which they are entitled and frustrating and preventing the Court from assuring that such relief is provided.
 
 
 27
 The order included the following remedial provision:
 
 
 28
 "Until the further order of this Court the following provision of Section 9, Chapter 67 1/2, Illinois Revised Statutes, to wit:
 
 
 29
 'If the area of operation of a housing authority includes a city, village or incorporated town having a population in excess of 500,000 as determined by the last preceding Federal census, no real property or interest in real property shall be acquired in such municipality by the housing authority until such time as the housing authority has advised the governing body of such municipality of the description of the real property, or interest therein, proposed to be acquired, and the governing body of the municipality has approved the acquisition thereof by the housing authority'
 
 
 30
 shall not be applicable to CHA's actions, including without limitation the acquisition of real property in the City of Chicago, taken for the purpose of providing Dwelling Units."
 
 
 31
 The district court had undoubted power to suspend the operation of the state statute.[1] "[S]tate policy must give way when it operates to hinder vindication of federal constitutional guarantees." North Carolina State Board of Education v. Swann, 402 U.S. 43, 45, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586 (1971).
 
 
 32
 In its February 10, 1969 opinion, the district court concluded (296 F.Supp. at 912):
 
 
 33
 "No criterion, other than race, can plausibly explain the veto of over 99 1/2% of the housing units located on the White sites which were initially selected on the basis of CHA's expert judgment and at the same time the rejection of only 10% or so of the units on negro sites."
 
 
 34
 Subsequently, of course, virtually no action was taken on any sites after the court fixed definite formulae for requiring at least 75% of dwelling units to be constructed in predominantly white areas.
 
 
 35
 The City Council by its earlier discriminatory action and later by its inaction has made itself a party to the discrimination "as a joint participant." Burton v. Wilmington Parking Authority, 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). In Louisiana v. United States, 380 U.S. 145, 156, 85 S.Ct. 817, 823, 13 L.Ed.2d 709 (1965), the Supreme Court held that the "need to eradicate past evil effects and to prevent the continuation or repetition in the future of the discriminatory practices shown to be so deeply engrained in the [state] laws, policies, and traditions . . . completely justified the District Court" in suspending the operation of state constitutional provisions in 21 parishes until voter discrimination had been remedied. In Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), the Court approved the action of the Supreme Court of California in striking down a provision of the state constitution because it involved the state in racial discrimination in the housing market.
 
 
 36
 In Hunter v. Erickson, 393 U.S. 385, 386, 393, 89 S.Ct. 557, 558, 562, 21 L.Ed.2d 616 (1969), the Court held that "amending the city charter [of the City of Akron, Ohio] to prevent the city council from implementing any ordinance dealing with racial, religious or ancestral discrimination in housing without the approval of the majority of the voters of Akron . . . discriminates against minorities, and constitutes a real, substantial, and invidious denial of the equal protection of the laws."
 
 
 37
 In Kennedy Park Homes Ass'n v. City of Lackawanna, 436 F.2d 108 (2d Cir. 1970), cert. denied, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971), the Court of Appeals, speaking through Mr. Justice Clark, sitting by designation, affirmed the district court's judgment requiring the city to take all necessary steps to enable the plaintiff to proceed with its low income housing project where the city had previously declared a moratorium on new subdivisions.[2]
 
 
 38
 In Hawkins v. Town of Shaw, 461 F.2d 1171 (5th Cir. 1972), the Fifth Circuit sitting en banc in a case requiring the town to submit a plan for the court's approval to cure the results of a long history of discrimination (437 F.2d 1286) said at 1172:
 
 
 39
 "In order to prevail in a case of this type it is not necessary to prove intent, motive or purpose to discriminate on the part of city officials. . . . '[W]e now firmly recognize that the arbitrary quality of thoughtlessness can be as disastrous and unfair to private rights and to public interest as the perversity of a willful scheme."'
 
 
 40
 The action of the district court in the circumstances of this case was within the range of its discretion. The defendants rely upon James v. Valtierra, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971), where the Court held that the California procedure for mandatory referendums, which was not limited to proposals involving low-cost public housing, did not violate the Equal Protection Clause. There the Court held that "the record . . . would not support any claim that a law seemingly neutral on its face is in fact aimed at a racial minority." 402 U.S. at 141, 91 S.Ct. at 1333. Here the record supports the trial court's conclusion that only race can explain the defendants' actions and subsequent inaction.[3]
 
 
 41
 Upon this record, the defendants were properly made parties-defendant and the trial court did not abuse its discretion in fashioning a remedy.[4] Inasmuch as that remedy facilitates CHA's compliance with the 1969 judgment order, CHA's burdens are eased rather than further laden.
 
 
 42
 The judgment order of April 10, 1972 is affirmed.
 
 
 43
 Affirmed.
 
 
 44
 SWYGERT, Chief Judge (concurring).
 
 
 45
 Judge Sprecher holds the City Council to be a "joint participant" in active racial discrimination earlier practiced by the CHA. Like Judge Pell, I cannot agree. The trial judge made no finding of joint participation. He can hardly be blamed; the plaintiffs made no mention of active joint participation at trial, and the record contains little, if any, support for a finding of discrimination by the City Council. Nor may reliance be placed on the findings made by the trial judge before the Council was made a party to this suit by supplemental complaint. The Council was not in privity with CHA, and I do not understand plaintiffs so to contend. See Rule 65(d), F.R.Civ.P. Finally, the plaintiffs do not raise a theory of joint participation on this appeal. Their legal theory of liability requires no connection of the Council with CHA and no finding of active discrimination on the part of the Council. I concur for that reason.
 
 
 46
 It is today well established that the failure of a municipality to alleviate racial imbalance in housing may be as grievous a violation of the equal protection clause as is direct action by a public body to advance discrimination among the races.[1] In both situations courts have saddled an offending party with the burden of demonstrating that a compelling governmental interest underlay the omission or commission, once a discriminatory effect thereof is shown inferentially or statistically by the complaining party.[2]
 
 
 47
 In this case, the inaction of the City Council had the effect of denying to plaintiffs the relief granted them when the district court first heard the cause.[3] The Council by its delay perpetuated a racially unbalanced distribution of public housing in the City of Chicago.[4] And it did so without apparent reason; the district judge found, and I agree, that the Council had shown no "supervening necessity . . . or indeed [made] any showing of any necessity or reason at all" for its failure to pass on CHA site submittals.[5] Not even a rational basis was advanced by the Council for its neglect, much less a compelling governmental interest. The Council is liable, then, for its delay. The only question remaining is one of remedy.
 
 
 48
 Other than his objection to Judge Sprecher's finding of "active participant" status for the City Council, Judge Pell appears to object to the form of remedy granted by the district judge. He would prefer, I think, a mandate directing the City Council to pass upon CHA submittals rather than the extant order requiring CHA to ignore Ill.Rev.Stat., ch. 67 1/2, Sec. 9 (1971), termed the "easier route" by Judge Pell. In support, he notes that the City Council is concerned with and retains control of city-wide planning and the zoning power, as well as the authority to control CHA by withholding funds or by cooperative agreement. 42 U.S.C. Secs. 1411(f), 1415(7) (1964). He points out, in addition, that the instant order might give pause to bond counsel, who approach the task of approving bond issues with "hypertechnical scrutiny."
 
 
 49
 I am not persuaded by these objections. The fact that the City Council retains considerable control over construction by CHA vitiates the argument advanced by the Council that it is somehow deprived of its important discretion to locate public housing with due regard to factors such as population density, environmental control and the provision of public services. Though it may indeed be true that the order at issue "will solve no problems," as the CHA contends, it is also possible that the City, by reason of the district court's order, will move speedily in all areas to assure a balanced placement of badly needed public housing. In any event, the Council has not yet moved to limit the CHA by exercise of its powers under federal law, and no order directed to those functions would now be appropriate. As the progress of litigation in the school desegregation cases has taught, remedy of discriminatory conditions is necessarily a step-by-step proposition. That further injunctive relief may be needed in this matter at some later date is no reason to deny the relief presently sought. As to the supposed recalcitrance of bond counsel, I find this too speculative to justify a denial of relief at this time. If the problem turns out to be one of insurmountable magnitude, the district court retains jurisdiction to modify its decree.
 
 
 50
 PELL, Circuit Judge (dissenting).
 
 
 51
 The majority opinion of this court affirms an order of the district court entered April 10, 1972, directing the Chicago Housing Authority to ignore a provision of the statutes of the State of Illinois which requires the approval, prior to CHA's acquisition of real property, of "the governing body of the municipality" involved. I respectfully dissent.
 
 
 52
 My dissent in no way records disagreement with the underlying objective of the district court which obviously is to eliminate racial discrimination violative of the Constitution from the program of housing carried out under the CHA aegis. My thinking on the score is no different today than it was when I concurred in the majority opinion of this court in Gautreaux v. Chicago Housing Authority, 436 F.2d 306 (7th Cir. 1970), cert. denied, 402 U.S. 922, 91 S.Ct. 1378, 28 L.Ed.2d 661 (1971), (Gautreaux I). Likewise I do not intend to suggest any lack of sympathy for or understanding of the difficulties that have beset the district court's continuing efforts to accomplish the stated objective.
 
 
 53
 I cannot conceive, however, that the due processes of the law should be abrogated by virtue of either commendable objective or difficulty of attainment. This court has in effect recognized this principle in one phase of the present litigation by reversing an order of the district court enjoining HUD from dispensing essentially nonrelated federal funds unless the city complied with certain stated conditions, the admitted purpose of which was to compel the city to approve CHA housing sites. Gautreaux v. Romney, 457 F.2d 124 (7th Cir. 1972). (Gautreaux III). This decision followed the mandate of this court in Gautreaux II (Gautreaux v. Romney, 448 F.2d 731 (7th Cir. 1971)) in which this court found violations of plaintiffs' rights in federal and city programs for low-income public housing as made available to low-income families in Chicago. It is to be noted that Senior Judge Duffy was the author of all three of the Gautreaux opinions and that Chief Judge Swygert concurred in both II and III.
 
 
 54
 Subsequent to the issuance of the opinion in Gautreaux III, the district court entered its order of April 10, 1972, here under challenge.
 
 
 55
 It is with some regret that I conclude the district court has again pursued an improperly oblique course to realize the goal originally established by its order of February 10, 1969, Gautreaux v. Chicago Housing Authority, 296 F.Supp. 907 (N.D.Ill.1969), which order was affirmed in Gautreaux I. At the time of the issuance of that order by the district court neither the City of Chicago nor any of its officials was a party to the suit. Nevertheless, the district court after so observing, stated, "they will be bound by any order entered in this case against CHA of which they have actual notice. FRCP 65(d)." 296 F.Supp. at 914.
 
 
 56
 Rule 65(d), however, quite explicitly states that injunctive orders shall be binding upon the "parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." At that time, there was no record establishment of active concert or participation which would catch Chicago or its officials in the binding effect net. Indeed, the court observed that there was no evidence that the aldermen who vetoed white sites were necessarily motivated by racial animus when they followed a policy of keeping Negroes out of white neighborhoods. 296 F.Supp. at 914. The status of evidentiary proof of active concert or participation on the part of the city or its officials remains unchanged although they have now been made parties to the action. While their having been made parites could clearly subject them to the binding effect of an order, no order has been entered against the City of Chicago, its mayor, or any of its aldermen, all of whom were made parties by the supplemental complaint filed by the plaintiffs on February 1, 1972. In the supplemental complaint the plaintiffs did not charge the City defendants with a violation of their constitutional rights. It has not been asserted that said defendants' objectives in considering the location of public housing have been other than constitutional. No evidence was offered indicating that the City defendants have been in "active concert or participation" with other defendants who may have been found to violate rights claimed by the plaintiffs.
 
 
 57
 Nevertheless, the April 19, 1972 order takes the direction of mandating CHA to ignore the following provision of Ill. Rev.Stat.1971, ch. 67 1/2, Sec. 9:
 
 
 58
 "If the area of operation of a housing authority includes a city, village or incorporated town having a population in excess of 500,000 as determined by the last preceding Federal census, no real property or interest in real property shall be acquired in such municipality by the housing authority until such time as the housing authority has advised the governing body of such municipality of the description of the real property, or interest therein proposed to be acquired, and the governing body of the municipality has approved the acquisition thereof by the housing authority."
 
 
 59
 The quoted portion of Section 9 is merely one paragraph of the Housing and Redevelopment Act of the State of Illinois which deals with the acquisition of property and gives the Housing Authority the power of eminent domain. The legislature of Illinois has decreed that in cities having a population in excess of 500,000, consent must be obtained from the governing body of the municipality. This condition precedent to the exercise of the power of eminent domain is now ordered to be ignored by the Chicago Housing Authority.
 
 
 60
 If this were a case in which it was demonstrated that the portion of the statute was unconstitutional on its face, which is not even suggested as far as I can see, or in which the statute was proven to be unconstitutionally applied, the situation might now be different. These issues, however, are not confronted or apparently considered in the court's April 1972 order.
 
 
 61
 It is obvious, of course, that the present path is far easier than would be the route of establishing unconstitutional application. The City Council, a legislative body, is concerned not simply with the operation of a public housing program, but it is also concerned, or should be concerned, with city-wide planning and zoning, with population density and environmental control, and with the provision of public services and the maintenance of a real estate tax basis adequate to support such services. These issues are troublesome and complex but in my opinion afford no excuse for taking the easier route of ordering CHA just to ignore the necessity of complying with the statute.
 
 
 62
 There is also no confrontation with the matter of financing the purchase of real estate, even if CHA did purport to exercise its eminent domain power without compliance with its enabling statute. The district court seems to be in essence saying go ahead and condemn irrespective of whether funds are available. Yet, 42 U.S.C. Sec. 1411(f) provides for a contribution by the state as a condition of a capital grant as follows:
 
 
 63
 "No capital grant pursuant to this section shall be made for any low-rent-housing or slum-clearance project unless the public housing agency receiving such capital grant shall also receive, from the State, political subdivision thereof, or otherwise, a contribution for such project (in the form of cash, land, or the value, capitalized at the going Federal rate of interest, of community facilities or services for which a charge is usually made, or tax remissions or tax exemptions) in an amount not less than 20 per centum of its development or acquisition cost."
 
 
 64
 Also, the district court order appears to ignore completely the federal statutory requirement for a cooperative agreement with the governing body of the locality involved. 42 U.S.C. Sec. 1415(7).
 
 
 65
 Although suggested by HUD in the court below, there is a complete disregard of the fact that financing is done by bonds. It needs no citation of authority to recognize that bonds disapproved by counsel will not sell and funds will not be raised. It is equally a matter of common knowledge that bond counsel traditionally approach approval of bond issues with what could be termed a hypertechnical scrutiny.
 
 
 66
 If the City authorities are in active concert and participation in implementing housing on an unconstitutional basis, then it appears to me that issue should be faced squarely and the accompanying problems should be the subject of scrutiny.
 
 
 67
 I recognize that the district court deemed itself to be engaged in a remedial process but it applied that remedial process by indirection to new parties without a sufficient foundation in the record. As Mr. Chief Justice Burger stated in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971):
 
 
 68
 "In seeking to define even in broad and general terms how far this remedial power extends it is important to remember that judicial powers may be exercised only on the basis of a constitutional violation."
 
 
 69
 Here it appears to me that the judicial power of legislative excision is being exercised without the necessary foundation of a constitutional violation by the parties immediately affected.
 
 
 70
 I have the uncomfortable feeling on this record that because of the tribulations, which should not be minimized, of this litigation, the zeal of the plaintiffs and perhaps the frustrations which the district court has felt in the particular conurbation context in not being able to accomplish a commendable objective, this case has now been transformed from one involving unconstitutional implementation of the Federal Low-Rent Housing Act into a case of claimed unconstitutional deprivation of low-cost housing. However, absent constitutional mandate, the assurance of adequate housing is a legislative not a judicial function. Lindsey v. Normet, 405 U.S. 56, 74, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972). The City Council of Chicago is a legislative body and it has the ultimate determination as to whether it should provide low-cost housing. It is only when it proceeds with low-cost housing in an unconstitutional manner that there should be judicial interference. Thus far there has been no judicial determination that the City is embarked upon such a course of interference. Without such a determination, the court should not order the legislative function of the City Council to be ignored.
 
 
 71
 Accordingly, I would reverse the order of the district court.
 
 
 
 [1]
 Inasmuch as the statute involved is not of state-wide application but relates solely to the affairs of one county in the state, it was not necessary to convene a three-judge court pursuant to 28 U.S.C. Sec. 2281. Moody v. Flowers, 387 U.S. 97, 101-102, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967). None of the parties has raised this issue
 
 
 [2]
 See also Crow v. Brown, 332 F.Supp. 382 (N.D.Ga.1971), affirmed, 457 F.2d 788 (5th Cir. 1972) (county enjoined from interfering with public housing by refusing building permits); Dailey v. City of Lawton, 425 F.2d 1037 (10th Cir. 1970) (city enjoined from denying building permits for construction of low-income housing)
 
 
 [3]
 See generally, Murasky, "James v. Valtierra: Housing Discrimination by Referendum?," 39 U. of Chi.L.Rev. 115 (1971); Reach, "The Application of the Equal Protection Clause to Referendum-Made Law: James v. Valtierra," 1972 U. of Ill. L.Forum 408 (1972)
 
 
 [4]
 See Recent Cases, Gautreaux v. Romney, 86 Harv.L.Rev. 427, 437-38 (1972)
 
 
 [1]
 Banks v. Perk, 341 F.Supp. 1175, 1182 (N.D.Ohio 1972); Sisters of Prov. v. City of Evanston, 335 F.Supp. 396, 403-405 (N.D.Ill.1971); Kennedy Park Homes Ass'n v. City of Lackawanna, 318 F.Supp. 669, 696-697 (W.D.N.Y.1970), aff'd 436 F.2d 108 (2d Cir. 1970); see Crow v. Brown, 332 F.Supp. 382, 390-391 (N.D.Ga.1971), aff'd 457 F.2d 788 (5th Cir. 1972); cf. Davis v. School District, City of Pontiac, Inc., 309 F.Supp. 734, 741-742 (E.D.Mich.1970)
 
 
 [2]
 Crow v. Brown, 332 F.Supp. 382, 391 (N.D.Ga.1971), aff'd 457 F.2d 788 (5th Cir. 1972); Kennedy Park Homes Ass'n v. City of Lackawanna, 436 F.2d 108, 114 (2d Cir. 1970); cf. Banks v. Perk, 341 F.Supp. 1175 (N.D.Ohio 1971); Gautreaux v. Chicago Housing Authority, 296 F.Supp. 907 (N.D.Ill.1969)
 
 
 [3]
 Finding H, Gautreaux v. City of Chicago, (N.D.Ill., April 10, 1972)
 
 
 [4]
 Cases such as Crow or Kennedy Park Homes, note 2, supra, differ factually in that the acts and omissions of the enjoined governmental entity were the direct cause of racially imbalanced housing conditions. As I have noted, the same cannot be said of the City Council on the record as it stands. If this is a distinction, however, it is one far too subtle to make a difference. The CHA is guilty of creating the imbalance; the City Council is guilty of maintaining it without justification and in derogation of a court decree aimed at rectifying the problem
 
 
 [5]
 Finding G, Gautreaux v. City of Chicago, (N.D.Ill., April 10, 1972)