In the

# United States Court of Appeals
## For the Seventh Circuit

—————

No. 05-3968

DOROTHY GAUTREAUX, ODELL JONES,
DOREATHA R. CRENCHAW, et al.,

*Plaintiffs*,

*v.*

CHICAGO HOUSING AUTHORITY and
TERRY PETERSON,

*Defendants-Appellees*,

and

DANIEL E. LEVIN and THE HABITAT
COMPANY LLC,

*Receiver-Appellees*.

APPEAL OF:

CENTRAL ADVISORY COUNCIL

—————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 66 C 1459—**Marvin E. Aspen**, *Judge.*

—————

ARGUED JUNE 9, 2006—DECIDED JANUARY 19, 2007

—————

Before RIPPLE, MANION and SYKES, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Central Advisory Council ("CAC"), not a party to this action in the district court, appeals the district court's denial of its motion to amend a 1996 order entered by the district court as part of its ongoing remedial relief in this class action brought against the Chicago Housing Authority for de jure segregation in public housing. Because CAC is not a "party" for purposes of appeal, we dismiss this appeal.

# I

# BACKGROUND

## A. History of the *Gautreaux* Action

In 1966, a class of individuals who either were living in Chicago public housing or on the wait list for public housing ("Gautreaux plaintiffs") brought this action against the Chicago Housing Authority ("CHA"). They alleged that CHA was practicing de jure housing segregation. *See generally Gautreaux v. Chicago Hous. Auth.*, 296 F. Supp. 907 (N.D. Ill. 1969). In 1969, the district court granted summary judgment to the Gautreaux plaintiffs, finding that CHA had selected housing sites using race as a criteria in violation of the Fourteenth Amendment. *Id.* at 913-14.

In the remedial phase of the proceedings, the district court entered an order that required the construction of three housing units in an area where the population is less than 30% non-white ("General Public Housing Area") for every unit built in an area where the population is greater than 30% non-white ("Limited Public Housing Area"). *See Gautreaux v. Chicago Hous. Auth.*, 304 F. Supp. 736, 737-38 (N.D. Ill. 1969). In the decades following, this

order has been modified several times to reflect changes in neighborhoods, circumstances and community housing needs.

In 1987, the district court appointed Daniel E. Levin as the Receiver ("Receiver") for the development of all new, non-elderly housing by the CHA. The Receiver was given broad power to develop and administer the new housing developments.

### B. The Central Advisory Council

CAC is an organization representing tenants currently residing in CHA public housing. Tenants in each public housing development, including the Cabrini Green Homes and Robert Taylor Homes, have formed resident councils whose memberships are limited to those persons residing in that housing development, as provided in the applicable United States Department of Housing and Urban Development ("HUD") regulations. *See* 24 C.F.R. §§ 964.115, 964.125. Each of these councils elects a president. CAC is a jurisdiction-wide council comprised of the presidents of each of these tenants' councils. *See* 24 C.F.R. § 964.105 (setting forth the composition and role of the jurisdiction-wide resident council). CAC is comprised of approximately twenty-three council presidents; this number includes three presidents of the resident councils of CHA senior public housing developments for elderly residents.

In 2000, a "Relocation Rights Contract" was negotiated between CAC and CHA. This agreement guaranteed to all CHA leaseholders residing in CHA properties as of October 1, 1999, the right to return to newly constructed or

rehabilitated housing as old housing was demolished. *See* R.85, Ex.B.

On June 27, 2000, the district court entered an order that stated that no revitalizing order could be entered or modified that would restrict or limit the opportunity of displaced CHA residents to return to a CHA property without CAC first being afforded an opportunity to present evidence and to be heard on the matter. A revitalizing order is a limited waiver of the 1969 injunction; such an order allows the construction of new housing in a Limited Public Housing Area when "a responsible forecast of economic integration, with a longer term possibility of racial desegregation, could be made" with respect to that area. R.64 at 2.

### C.  Background of the Current Action

The dispute before us today involves a development called Lake Park Crescent, which is located in the North Kenwood-Oakland area on the south side of Chicago. Lake Park Crescent was built by a private developer and overseen by the Receiver. The North Kenwood-Oakland neighborhood formerly had contained high-density, dilapidated public housing; CHA demolished the high-rise buildings in the neighborhood and sought adequate housing alternatives.

On June 3, 1996, the district court issued a "revitalizing order" for the North Kenwood-Oakland neighborhood. This order stated that, in order to prevent a re-concentration of public housing, any new public housing in the North Kenwood-Oakland neighborhood must be economically integrated; one-half of the units must be reserved for low-income families earning 50-80% of the area

median income ("AMI"), while the other half could be occupied by very low-income families earning 0-50% of the AMI. *See id.* at 3.

The first phase of Lake Park Crescent was completed and had sixty public housing units: thirty reserved for families earning 50-80% of AMI, and thirty reserved for families earning 0-50% of AMI. The developer had no difficulty finding families to occupy the 0-50% units; however, it did encounter difficulty identifying eligible existing public housing tenants to occupy the 50-80% units. Consequently, some of those units remained vacant. The developer contacted all families on CHA's waiting list who satisfied the existing income limits; in August 2004, an open house was held for CHA families at or above 50% AMI; in February 2005, CHA began an outreach effort to wait list families in the surrounding communities; and, in March 2005, CHA began to contact the entire wait list. As of May 20, 2005, nine of the thirty units (requiring 50-80% AMI) were occupied, and eleven other units were assigned to individuals whose applications were being processed. R.110 at 10-11. Nevertheless, there was still concern about filling the remaining 50-80% AMI units.

### D. District Court Proceedings

On May 3, 2005, CAC filed a motion to amend the 1996 revitalizing order to allow working public housing families to occupy the units reserved for those who make 50-80% of the AMI, even if their income was not as high as 50% of the AMI. R.85 at 2. In that motion, CAC expressed a concern that the developer was planning a site-based wait list for Lake Park Crescent that would invite

members of the general community to live in Lake Park Crescent. *Id.* CAC contended that such a list would bypass the thousands of current and past CHA residents who are currently on wait lists awaiting housing relocation. *Id.*

The Receiver opposed CAC's motion and offered three other options to the district court. The first option was to continue efforts to locate qualified tenants (earning 50-80% AMI) from the CHA wait list; the second option was to locate qualified tenants (earning 50-80% AMI) from the pool of existing CHA tenants who already had made permanent housing relocation choices; the third option was to create a site-based waiting list drawing from members of the broader (non-CHA) community to fill any units that would remain vacant due to insufficient numbers of CHA wait listed families meeting the income criteria.

The Gautreaux plaintiffs filed a brief stating that there was merit to the contentions of both CAC and the Receiver. CHA also filed a brief, stating that it "supports and is willing to implement" either the site-based wait list strategy proposed by the developer or CAC's proposal to relax the income requirements and that "one or the other plan should be adopted promptly." R.109 at 5.

On July 7, 2005, the district court held a hearing. A number of parties and interested persons testified, including representatives of CAC, CHA, HUD, the Gautreaux plaintiffs and the Receiver and North Kenwood-Oakland community representatives. CAC was concerned that a site-based wait list that drew in residents from outside CHA housing would take away units owed to CHA leaseholders under the 2000 Relocation Rights Contract ever since the CHA began demolishment of their high-rise homes. R.187 at 8.

The Receiver contended that CAC's motion would threaten his ongoing efforts to generate public support for replacement public housing because he would be breaking a promise he had made to the North Kenwood neighborhood. He had said that the new housing would be mixed-income housing. *Id.* at 16-19. The Receiver submitted that, if the court allowed his promises to the neighborhood to be breached, it would diminish his credibility and hamper his efforts to get neighborhood support for public housing for future developments. Alderman Toni Preckwinkle, who represents the North Kenwood-Oakland neighborhood, and Shirley Newsome, chair of the North Kenwood-Oakland Conservation Community Council, also testified and expressed their disapproval of CAC's plan. Both asserted that the community had been promised by the Receiver that any new housing would be mixed income so as not to repeat the concentrations of poverty caused by the previous, high-rise public housing.

The Gautreaux plaintiffs admitted that the decision was a "tough one." They did not want to take a position contrary to the community's wishes; nevertheless, they were concerned that, although many of the Gautreaux plaintiffs still were waiting for housing, the units in question might be given to families who were not class members and who were not on a CHA wait list. *Id.* at 12-16. Despite this reservation, CHA again informed the district court that it would implement either the CAC or the site wait list plan. It also informed the court that, as of the morning of July 7, fifteen of the thirty units reserved for 50-80% AMI were still unfilled. *Id*. at 9.

A HUD representative, Janet Elson, testified that she appreciated the positions of both CAC and the Receiver,

but that "the notion of a campaign to bring in people who are not on the current CHA waiting list is problematic to HUD." *Id.* at 36. Elson testified that there may be a compromise position of lowering the AMI to 40%, rather than eliminating it, because the 40% AMI families are still "working," "quality" families. *Id.* at 37.

The district court denied CAC's motion to amend the June 3, 1996 order. The court briefly summarized the positions of the interested parties, and stated that it "[did] not see an extraordinary change in circumstances at this time which suggests we must modify our June 3, 1996 order by removing the 50-80% [AMI] provision." R.136 at 2.

On July 14, 2005, the district court also issued an order modifying various earlier orders to "permit the creation of an on-site waiting list at the Lake Park Crescent [development] . . . for households earning between 50% to 60% of the area median income." R.135-3 at 1. The waiting list was to be comprised of tenants solicited from the general public, households who are currently on CHA wait lists for public housing and households currently in public housing. *Id.* at 1-2. The court further ordered that priority should be given to any person on the wait list who previously was listed on a CHA general wait list or who is currently living in CHA housing. *Id.* at 2. The court also ordered that CHA continue to mail notice of the availability of the units to each individual on the CHA wait lists. *Id.*

CAC then filed a motion requesting the district court to clarify whether its July 14, 2005 order applied only to the already-completed Phase I of Lake Park Crescent or whether it applied to all public housing that will be built under the North Kenwood 1996 revitalization order. *See*

R.137 at 4. The motion also requested clarification as to whether the July 14, 2005 order waived certain HUD regulations that CAC argued were violated by CHA's income requirements and by opening the wait list to the general public. *Id.* at 3. The court denied CAC's motion on September 9, 2005 without any stated reason. *See* R.168.

CAC then filed this appeal, arguing that the district court abused its discretion when it denied CAC's motion to modify the 1996 revitalization order.

## II

## DISCUSSION

Before we begin our analysis of the parties' claims, it is important to note the unique context in which this case reaches us. CAC is the appellant in this case. Although there is substantial overlap between the individuals represented by the CAC and by the Gautreaux class representatives, the membership of the two groups is not the same. CAC represents all tenants currently in CHA public housing, which includes the elderly tenants who live in CHA senior housing developments. The Gautreaux plaintiffs include those who currently live in CHA public housing developments, but not including residents of CHA senior housing. The Gautreaux plaintiffs also represent individuals currently on the CHA wait list, which is a group of individuals that is not represented by CAC.

Both the Receiver and CHA filed briefs as appellees in this case. The Gautreaux plaintiffs did not file a brief or participate in the appeal.

The Receiver and CHA submit that CAC has no "standing" to appeal the district court's denial of its motion to

modify the 1996 Revitalization order.[1] CAC does not contend that it was a party to the underlying litigation; rather, it insists, both in its appellate briefing and at oral argument, that it is a nonparty to the litigation. It did not formally intervene in the district court proceedings; the district court considered CAC's motion without any sort of formal intervention.[2]

It is well-established that, as a general rule, a nonparty cannot challenge on appeal the rulings of a district court. *See, e.g., Marino v. Ortiz*, 484 U.S. 301, 304 (1988) (per curiam); *B.H. ex rel. Pierce v. Murphy*, 984 F.2d 196, 199 (7th

---

[1] As discussed below, the right of a nonparty to appeal the decision of the district court "does not implicate the jurisdiction of the courts under Article III of the Constitution," thus it is not an issue of "standing." *Devlin v. Scardelletti*, 536 U.S. 1, 6 (2001). The Supreme Court has noted that federal courts "have been less than meticulous" in their use of the term "jurisdiction." *Kontrick v. Ryan*, 540 U.S. 443, 454 (2004). The Court noted that "[c]larity would be facilitated if courts and litigants used the label 'jurisdiction' . . . only for prescriptions delineating the classes of cases (subject matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority." *Id.* at 455. In the same vein, we shall refrain in this opinion from using the jurisdictional term of art, "standing," to describe the right of a nonparty to seek appellate review of a district court's decision.

[2] We recognize that the district court did issue an order in 2000 allowing CAC the right to "be heard" and "present evidence" before any revitalizing order was entered or modified. Order of June 27, 2000. However, this order did not formally allow CAC to intervene, nor did it establish CAC as a "party" to the litigation. Therefore, any right CAC has to appeal does not stem from this order.

Cir. 1993). CAC relies on a recognized exception to this rule that allows unnamed class members to participate in an appeal of a class action settlement without formal intervention. *See Devlin v. Scardelletti*, 536 U.S. 1, 14 (2002); *In re Bridgestone/Firestone, Inc., Tires Prod. Liab. Litig.*, 333 F.3d 763, 768 (7th Cir. 2003). In *Devlin*, the Supreme Court announced that "nonnamed class members . . . who have objected in a timely manner to approval of the settlement at the fairness hearing have the power to bring an appeal without first intervening." 536 U.S. at 14. A nonnamed member of a class action lawsuit, Devlin, objected to a proposed settlement; the district court approved the settlement over the objections it heard, including those advanced by Devlin. *Id.* at 5. Devlin then appealed, challenging the fairness of the settlement. *Id.* at 6. The Supreme Court considered whether Devlin, as a nonnamed class member, could appeal the settlement. The Court first stated that the question was not one of Article III standing because Devlin had an interest in the settlement sufficient to meet the "case or controversy" test. *Id.* at 6-7. It further stated that appeals by nonnamed class members do not raise prudential standing concerns. *See id.* Instead, the Court classified the question as "whether [Devlin] should be considered a 'party' for purposes of appealing the approval of the settlement." *Id.* at 7; *see also* Fed. R. App. P. 3(c)(1)(A) (stating that, on appeal, the notice of appeal must "specify the party or parties taking the appeal").

The Supreme Court held that the nonnamed class member was a "party" for purposes of appeal, allowing him to appeal the "aspect of the District Court's order that affects him." *Devlin*, 536 U.S. at 9. The Court stated that such an appeal "cannot be effectively accomplished

through the named class representative," because, once the class representative had approved the settlement, its interests had diverged from those class members who had objected to the settlement. *Id.* The Court noted that "[w]hat is most important to this case is that nonnamed class members are parties to the proceedings in the sense of being bound by the settlement." *Id.* at 10.

We must determine whether CAC is a "party" for purposes of appeal. We do not believe that the Supreme Court's holding in *Devlin* supports our permitting CAC to appeal in this case. The present action is different from *Devlin* in several important ways. First, CAC cannot be charactered as an "unnamed" class member. Assuming that CAC may represent the interests of a number of unnamed class members, it also represents individuals who are not class members and who are not affected by the remedial orders—the elderly tenants in senior citizen CHA housing. Additionally, unlike the situation in *Devlin*, there is no indication here that the Gautreaux plaintiffs, who represent the class, have interests antagonistic to those of CAC and, therefore, are impaired from representing effectively CAC's membership. *Cf. Devlin*, 536 U.S. at 9. The Gautreaux plaintiffs have every incentive to ensure that those currently in CHA housing, as well as those on CHA wait lists, are given priority in filling any public housing vacancies.[3]

Moreover, in *Devlin*, the Supreme Court stated that "[w]hat is most important to this case is that nonnamed class members are parties to the proceedings in the sense of

---

[3] The Gautreaux plaintiffs actually testified before the district court in support of CAC's position. *See* R.187 at 12-16.

being bound by the settlement." 536 U.S. at 10. *Devlin* therefore reflects a concern that, without an opportunity to appeal, unnamed class members will have no other recourse than to accept the terms of a settlement and to forfeit further pursuit of their claim. Indeed, some circuits have noted a hesitation to extend *Devlin* beyond the procedural context of a class action settlement agreement to which class members do not have the opportunity to opt out. *See P.A.C.E. v. Sch. Dist. of Kansas City*, 312 F.3d 341, 342-43 (8th Cir. 2002) (holding that *Devlin* was inapplicable to a situation where class members wanted to "challenge individual litigation decisions by class counsel during the pendency of the suit"); *In re Gen. Am. Life Ins. Co. Sales Practices Litig.*, 302 F.3d 799, 800 (8th Cir. 2002) (noting, in dicta, that there is "considerable merit" to the contention that *Devlin* does not apply to class actions certified under Federal Rule of Civil Procedure 23(b)(3), from which class members may opt out). The Eleventh Circuit has stressed that *Devlin* "allow[s] appeals by parties who are actually bound by a judgment, not parties who merely *could* have been bound by a judgment." *AAL High Yield Bond Fund v. Deloitte & Touche LLP*, 361 F.3d 1305, 1310 (11th Cir. 2004) (emphasis in original). Because CAC is not "bound" by a final judgment, it does not qualify as a party to the litigation for purposes of appeal.

The task of a district court faced with the task of administering a decree for equitable relief in an institutional case such as this one is a difficult one. The federal constitutional or statutory violation must be eliminated, but, at the same time, the district court must be careful to limit its intrusion into local matters to those circumstances in which federal law is offended. Indeed, this type of institutional remedial litigation "differs in almost

every relevant characteristic from relief in [a] traditional model of adjudication" because orders like the 1969 order "prolong[] and deepen[], rather than terminate[], the court's involvement with the dispute." Abram Chayes, *The Role of the Judge in Public Law Litigation*, 89 Harv. L. Rev. 1281, 1298 (1976); *see also id.* at 1301-02 (noting that, in "an ongoing remedial regime," the district court is involved in "actively shaping and monitoring the decree, mediating between the parties, [and] developing [its] own sources of expertise and information," with the district court becoming a "policy planner and manager"). In this case, the district court has been monitoring the parties' actions for nearly forty years. In order to monitor effectively the CHA's selection of housing development sites, the district court had to be able to modify its earlier orders as circumstances, especially city demographics, change. This task required that the court gather and assess information and tailor its orders to maintain the delicate balance between legitimate federal judicial authority and the right of local authorities to fulfill their vital responsibilities.[4] In accomplishing this task, it is important that the district court carefully examine and weigh the impact on the legitimate interests on all affected groups. *See Barnett v. Daley*, 32 F.3d 1196, 1203 (7th Cir. 1994). Therefore, it is quite understandable that the district court considered

---

[4]  *See, e.g.*, *New York State Ass'n for Retarded Children, Inc. v. Carey*, 706 F.2d 956, 969 (2d Cir. 1983) (stating that "in institutional reform litigation . . . judicially-imposed remedies must be open to adaptation when unforseen obstacles present themselves, to improvement when a better understanding of the problem emerges, and to accommodation of a wider constellation of interests than is represented in the adversarial setting of the courtroom").

the concerns of organizations like CAC regarding the Lake Park Crescent development.

Here, the district court was trying to determine a feasible solution to the difficulty that the Receiver was facing in filling certain units at Lake Park Crescent. Unfortunately, permitting CAC to participate in the proceedings by way of a formal motion led to misapprehension on the part of that nonparty that it could appeal the district court's decision. CAC suggested one solution to the district court, which the court considered and rejected after soliciting testimony from others interested in the development of public housing in the North Kenwood-Oakland Neighborhood. However, listening to an organization's views in the search for a practical, workable solution does not vest that organization with the right to appeal the district court's ultimate decision on the course that the parties must take.

## Conclusion

For the foregoing reasons, the appeal is dismissed.

APPEAL DISMISSED

A true Copy:

      Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*